**Carrie JORDAN, Appellant,**

v.

**Jerry and Pamela DOSSEY, Appellees.**

**No. 01–09–00618–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

May 13, 2010.

Jeffrey L. Oldham, Bracewell & Giuliani LLP, Houston, TX, for Appellant.

Ellen A. Yarrell, Houston, TX, Sallee S. Smyth, Richmond, TX, for Appellees.

Panel consists of Chief Justice RADACK, and Justices ALCALA and HIGLEY.

## OPINION

ELSA ALCALA, Justice.

In this termination of parental rights case, the biological mother claims her child was kidnapped by the biological father, but the current caretakers of the child call that claim "revisionist history." Agreeing that the assertions by the biological mother lack credibility, the trial court rendered judgment terminating the parental rights of appellant, Carrie Jordan, the biological mother of R.A. The trial court also appointed the current caretakers of the child, appellees, Jerry and Pamela Dossey, as sole managing conservators of R.A. In this accelerated appeal, Jordan contends in her first issue that the evidence is legally and factually insufficient (1) to support termination under three statutory grounds found in section 161.001(1) of the Texas Family Code, and (2) to support a finding that termination of her parental rights is in the best interest of R.A. *See* TEX. FAM. CODE ANN. § 161.001(1), (2) (Vernon Supp. 2009). If we sustain the first issue, Jordan's second issue requests that we remand the case for the trial court to reassess its determination of conservatorship. Because our review of the record shows the evidence is legally and factually sufficient to support termination of Jordan's parental rights, we affirm.

## Background

Jordan is the biological mother and James E. Akin is the biological father of R.A., who was born on November 5, 2006. Jordan had custody of R.A. for the first three weeks of his life, but not since then. Akin had custody of R.A. from the time R.A. was three weeks until one year of age. R.A. has been cared for by the Dosseys for over two years since he turned one year of age. The evidence presented at trial discussed (A) the events before R.A. was born, (B) the first ten months of R.A.'s life from the time he lived with Jordan to the time he lived with Akin, (C) the tenth through twelfth months of R.A.'s life when Akin met Jerry Dossey and gave R.A. to him and his wife, and (D) the events transpiring during the second and third years of R.A.'s life.

### A. The Events Before R.A. Was Born

Medical records show that by age 15, Jordan had been sexually abused, diagnosed with "major depression," suffered from "psychiatric/substance abuse," and had "10 to 15 suicide attempts" by "drink[ing a] cleaning product, cutting and self-mutilation." At trial, Jordan denied that she had tried to kill herself that many times, claiming she only tried to kill herself twice, once as a teenager and once as an adult. At age 19, she was diagnosed with a seizure disorder.

In January 2006, while enrolled in college, Jordan was sexually assaulted in her apartment. She dropped out of school and moved into a shelter in Oklahoma City, Oklahoma. After a few weeks at the shelter, Jordan met Akin, became pregnant with R.A., and she quickly left the shelter to live with Akin.

During the first five months of her pregnancy with R.A., Jordan lived with Akin in a transient lifestyle in "crack houses" and around criminals. Jordan acknowledged that she could barely care for herself during this period of time. She observed that Akin was usually unemployed, unable to keep a job, and unable to support her. Within several months of meeting Akin, Jordan learned he was a convicted sexual offender, although she claimed at trial she did not know about that until much later. Jordan also learned he was a violent person. Jordan stated that he struck her on at least 10 occasions while she was pregnant and that she knew this endangered R.A. when he was a fetus. Medical records document that Jordan said that when she was pregnant, Akin pushed her, kicked her, and punched her in the face. While she was pregnant with R.A., police officers had to frequently respond to what Jordan described as "domestic" calls.

During the last four months of her pregnancy, Jordan lived in a shelter called the Rose Home, which was run by Rhonda Davis. The Rose Home is a home for pregnant women with mental illnesses. There, she received prenatal care, parenting classes, and enrolled in a program that assists newborns. When she initially moved into the Rose Home, according to Jordan, Akin visited her often and was renovating a home for them to move into, but according to Davis, Akin infrequently visited and appeared uninterested in Jordan.

While eight months pregnant, Jordan attempted suicide with a broken mirror, requiring her hospitalization in September 2006 at St. Michael's Hospital. At trial, Jordan denied that this was a suicide attempt, explaining that she had only suicidal ideations caused by Akin's sudden failure to take her to the home he said he had renovated for them and by her inability to contact him.

Four of the last six weeks of Jordan's pregnancy were spent at Midwest Regional Hospital. According to Jordan's trial testimony, Akin visited her there once, and he told her that he had not appeared earlier because he had been arrested for fighting and extradited to another state. After this single visit by Akin in the final three months of Jordan's pregnancy, Akin failed to appear at the hospital when R.A. was born on November 5, 2006.

## B. The First Ten Months of R.A.'s Life

After giving birth to R.A., Jordan returned to the Rose Home where she resided with R.A. Within two or three days of R.A.'s birth, Davis took Jordan to the house where Akin was living on 7th Street. Jordan showed R.A. to Akin, but Akin was not interested in them. According to Davis, Akin refused to speak to Jordan as Jordan was "begging" him for attention.

There is conflicting testimony regarding Akin's presence at the Rose Home and the

circumstances surrounding Akin's removal of R.A. from the Rose Home. The day after Jordan visited Akin, he may have come to the Rose Home on November 12, 2006. Jordan's trial testimony stated that he did, but her deposition testimony was that he did not, and Davis's testimony was that he did not. Similarly, depending on which version of the events is believed, Akin may have come to the Rose Home on the day before Thanksgiving, which was November 24, 2006, and left with R.A., either with or without Jordan's consent. Jordan testified at trial that Akin "kidnapped" R.A. when he kept him without permission following what was supposed to be a short trip to the grocery store to pick up items for Thanksgiving dinner. In contrast, Jordan's description to Special Agent Mike Phill was that R.A. was taken by Akin when Akin left her a note or called her stating he was keeping R.A. Other evidence, however, shows that Jordan gave R.A. to Akin for him to take care of because Jordan hoped that his bonding with the child would help them reunite as a family. Davis testified that when she saw that R.A. was not with Jordan at the Rose Home, she offered to retrieve R.A. from Akin, but Jordan told her everything was okay because Akin was good with children. Davis's impression of the situation was that Jordan wanted Akin to have R.A. Davis's impression was consistent with Akin's statements made in a letter to Jordan written much later after these events. Akin said he never wanted possession of R.A. and was "stuck" with R.A. due to Jordan's disappearance.

From November 24, 2006, when Jordan claims R.A. went to live with Akin, to three weeks later on December 16, when she was asked to leave the Rose Home, Jordan resided at the Rose Home without R.A. Depending on which version of the events is believed, either she was uninterested in taking R.A. from Akin or she was frantically searching for them. Davis described Jordan as not wanting Davis's assistance when Davis offered to take her to get R.A. from Akin, explaining that Jordan appeared to want Akin to have R.A. In contrast, Jordan's trial testimony conveys that she notified police officers, Legal Aid, and private attorneys. Aside from her trial testimony, however, no other evidence shows Jordan contacted anyone to seek custody of R.A. during this period of time while she was living at the Rose Home.

On December 16, Jordan was asked to leave the Rose Home because Davis thought Jordan was a "danger to herself . . . or others" after she made threatening gestures with a knife. Jordan acknowledged that she was asked to leave the Rose Home, but she minimized the reason, stating all she did was slam the dishwasher door.

When she left the Rose Home on December 16, Jordan immediately walked 24 blocks to the 7th Street address where Akin was living with R.A., and had a seizure while arguing with Akin. According to Jordan's trial testimony, Akin walked out of the house holding R.A., walked back into the house, handed R.A. to someone inside the house, and walked out of the house empty handed, refusing to give her R.A. Jordan later told medical personnel who were treating her that she saw R.A. had crusted blood under his nose and bruises. Following the seizure, Jordan was taken by ambulance to University of Oklahoma (OU) Medical Center, where she was quickly committed involuntarily when she tried to commit suicide by hanging herself there. She was in the OU hospital from December 16 to 21 of 2006, then either in a shelter or homeless from December 22 to 28 in 2006, and then hospitalized again from December 28, 2006 to January 17, 2007 at Midwest Regional Medical Center (Midwest) for "major depressive

disorder, recurrent, severe with suicidal thinking psychotic features[,]" psychosis, borderline personality disorder, as well as other conditions.

During this month, from December 16, 2006, to January 17, 2007 when Jordan was hospitalized for her suicide attempt and suicidal ideations, depending on which version of the events is believed, either Akin held R.A. with Jordan's consent or Akin continued to possess R.A. without Jordan's permission. Jordan's statements contained within the medical records for this period of time vary from day to day concerning whether she was claiming then that R.A. was kidnapped, or claiming that R.A. was with his father under her consent. For example, Jordan testified that she tried to get assistance from the police who refused to help her, but medical records show Jordan was "considering" calling the police. Jordan also testified she contacted Legal Aid and private attorneys, but the medical records are silent concerning any efforts by her to contact Legal Aid and private attorneys.

Based on some of Jordan's statements about Akin's possession of R.A. to the medical personnel who were treating her when she was admitted into the OU Medical Center on December 16, the personnel contacted the Oklahoma Department of Human Services (DHS). The medical records show DHS quickly investigated the situation by going to Akin's house and speaking to Akin. The medical records document that DHS determined R.A. was not at risk, and closed the investigation on January 10, 2007. After the case was closed on January 10, other than Jordan's trial testimony, the record shows no evidence of contacts between Jordan and DHS or any other child welfare agency.

There is also conflicting testimony regarding whether or not Jordan knew how to reach Akin from January 10 through September 2007. Either Jordan did not know how to reach Akin after January 10 through September 2007, or she knew where he was living and she was in communication with him. Jordan testified at trial that Akin called her in July 2007 to ask that she mail R.A.'s social security card, which she states she did because he threatened her. Akin, however, in a letter written much later, denied having any contact with Jordan who he said disappeared after she gave him R.A.

After her release from the hospital on January 17, 2007, Jordan resided at the Hope Services Center Standers Estate for about nine months until September. The center provided ongoing programs for people released from the hospital on a mental health commitment. Depending on which version of the events is believed, either Jordan continued to look for Akin and R.A. for the first nine months of 2007 and could not find them, or she knew where they were and consented to the situation. At trial, Jordan described a nonconsensual situation where she searched for them, but that version is different from the version she told to Detective Feskanich. In a statement to Detective Feskanich, Jordan said that "when she was down at the Hope Center, she knew that the child was still living at the residence." When the Detective asked her why she did not make contact with Akin at that time, Jordan "never" gave him a "definite answer" why she could not go there except that she had "curfew."

Starting in the latter half of June 2007, after R.A. had been gone over six months, the record shows documentation of minimal efforts by Jordan to gain custody of R.A. On June 20, 2007, Jordan asked Legal Aid for help, but it declined representation, offering instead to draft all legal documents that would be required for Jordan to petition the court for custody of R.A.

Jordan decided not to represent herself and did not pursue the legal action at that time. Although she also claimed at trial that in the "mid to late" summer of 2007 she contacted the Logan County authorities regarding Akin's status as a sex offender, no documents verify this claim.

In September 2007, Jordan moved out of the Hope Center and into her own apartment after she received a lump sum disability payment totaling between $6,000 and $7,000 from Social Security. She acknowledged that she did not use the money to hire an attorney to pursue legal action against Akin, but instead used the funds to move into an apartment, pay off debts, and buy furniture.

## C. The Tenth through Twelfth Months of R.A.'s Life

When R.A. was ten months old, Akin began work on September 26, 2007 for a company owned by Jerry Dossey. One day between October 11 and 23 of 2007, Akin asked Jerry for a ride to work. When Jerry arrived to pick up Akin, Akin was standing on a corner in front of a house holding several bags and R.A. According to Jerry, Akin "stated that his girlfriend had called the Department of Human Services on him for abuse of his child and that they had came and cleared him and looked at the child and released him." Jerry drove Akin to another house where Akin left his belongings. Jerry described R.A. as dirty and "nonresponsive" with no emotion at that time.

When Jerry and Akin returned from a job on the road on October 29, 2007, Akin told Jerry that he did not have anywhere to go, and Jerry paid for Akin to stay in a motel for six nights until the next job on November 4. While Jerry was driving Akin to the motel, Jerry asked whether Akin wanted to pick up R.A. Akin said that R.A. was at the babysitter's house and that he did not want to see R.A. After explaining

that he had seen Jerry with his adopted daughter, Akin asked him if he would like to adopt R.A. Akin told Jerry he had no family who could take R.A. and that R.A.'s mother had committed suicide after R.A. was born. Jerry said he would have to discuss it with his wife. After a meeting between the Dosseys and Akin, the Dosseys agreed to care for R.A. and obtained a signed power of attorney from Akin on November 20, 2007.

R.A. was living in a deplorable situation when the Dosseys rescued him soon after obtaining the signed power of attorney. Akin had left R.A. with a person he called a "babysitter." The babysitter lived in a "crack house" that was "covered in alcohol bottles," "very dirty," and "smelled like feces." Jerry loaned Akin $150 to pay the babysitter, who demanded the money in exchange for R.A. R.A. was filthy, covered in human feces, and his penis had fused to his scrotum causing his skin to peel off there. R.A. had an "explosive" fear of taking a bath. R.A. did not cry or show emotion. When R.A. ate, he ate as much as he could and then stored food in his mouth, which is a condition that occurs when a child is irregularly fed. A medical examination of R.A. revealed he had scabies.

## D. Events Transpiring the Second and Third Years of R.A.'s Life

On December 20, 2007, after the Dosseys began caring for R.A., Akin stopped working for Jerry. Although they could not locate Akin for information, the Dosseys attempted to get a birth certificate for R.A. and a death certificate for R.A.'s mother by trying to obtain information from the babysitter where R.A. had been recovered, as well as Akin's ex-girlfriend Jessica. Information given by Jessica led Jerry to the Rose Home, where he learned Jordan had been before she moved to the

Hope Center. Due to confidentiality, however, Jerry could not obtain more information about Jordan or R.A. Jerry spoke to a neighbor, Officer Phillip Stewart who worked for the Harrah, Oklahoma police department. Jerry gave Officer Stewart the names of Jordan and R.A. to see if Stewart could find any information about them but Stewart reported that he could not find Jordan in his records.

Around January 2008, as they were planning their move from Oklahoma to Texas for a different employment opportunity for Jerry, the Dosseys contacted an attorney in Texas to determine how to proceed to adopt R.A., in light of the abandonment of the child by Akin and the suicide of R.A.'s mother. The attorney advised them to wait six months before filing the case. The Dossey family moved to Sugar Land, Texas in April 2008.

Around the time the Dosseys took custody of R.A. in late 2007, Jordan contacted various police agencies in search of R.A., which led her to Special Agent Mike Phill with the Minnesota police department in March 2008. Soon after that, Jordan received a telephone call in March 2008 that revealed information that led to her learning that the Dosseys had possession of R.A. More specifically, in March 2008, Jerry Dossey's mother contacted Jordan's parents, but did not identify herself. She asked if Jordan was still alive and various questions regarding Jordan and her relationship with Akin. The number was registered to Bill Sibley, Jerry's father. Jordan's parents told Jordan about the call and gave her the number. Jordan called Jerry's mother, but could not find out any information. Jordan then contacted Special Agent Phill, who contacted various police agencies.

In August 2008, Akin was found at a shelter in New York City and charged for failing to register as a sex offender. When questioned by New York police detectives regarding the location of R.A., Akin refused to answer questions and referred them to his attorney. The detectives, however, did discover there was a connection between the Dosseys and Akin, and contacted Special Agent Phill. Special Agent Phill learned the Dosseys had moved to Sugar Land, Texas. Special Agent Phill then requested that Detective Feskanich meet with Jordan so that Oklahoma could open a Missing and Exploited Children case because R.A. had never been reported as missing in Oklahoma.

Detective Feskanich testified that his first involvement in this case concerning R.A. was in September 2008, when Jordan made a report of a missing child to the Oklahoma City Police Department. Feskanich searched to see if a prior missing child report for R.A. had been filed and found none. He explained that if someone had claimed a child was in danger, he believed a police report would have been generated. Detective Feskanich contacted the Dosseys and told them to take R.A. to the Sugar Land police department where R.A. could be checked and verified as safe and healthy. The Sugar Land police allowed R.A. to remain with the Dosseys after verifying he was safe. Detective Feskanich learned that the Dosseys had hired an attorney to facilitate an adoption and that they intended to keep R.A. Detective Feskanich and Special Agent Phill reported that they were satisfied that R.A. was in a "clean, loving home" and the Detective instructed Jordan that she needed to file a case in a court in Texas to have a judge determine custody.

According to Jerry, he and his wife first found out on September 4, 2008 that Jordan was alive. Prior to that time, he had no suspicion that she was alive. Jerry testified that he did not have any knowledge of any contact that occurred between

his mother and Jordan's mother, explaining he was upset about learning about the contact during discovery in this lawsuit, and maintaining that he did not know Jordan was alive until he learned about it in September 2008.

Around the time R.A. turned two years of age in November 2008, Jordan obtained pro bono counsel and sued to establish sole conservatorship of R.A. The Dosseys responded to Jordan's suit by filing a petition seeking sole conservatorship, termination of Jordan's and Akin's parental rights, and the right to adopt R.A.

The trial court held a bench trial that lasted six days. It heard testimony from the Dosseys, Detective Feskanich, Special Agent Phill, Davis, Jordan, an amicus attorney, and Janie Cravens, a licensed social worker who testified that it would be in the child's best interest to remain with caretakers with whom the child has bonded. The trial court terminated Akin's parental rights by entering a default judgment. The trial court also terminated Jordan's parental rights after finding that termination of the parent-child relationship was in the best interest of R.A., and that she committed three grounds under section 161.001(1) by leaving R.A. alone or in the possession of another without providing adequate support and remaining away for a period of at least six months (section C); knowingly placing or allowing R.A. to remain in conditions or surroundings that endanger his physical or emotional well-being (section D); and engaging in conduct or knowingly placing R.A. with persons who engaged in conduct that endangers his physical or emotional well-being (section E).[1] The court then appointed the Dosseys as managing conservators. Jordan filed a motion for new trial and a motion for a judgment notwithstanding the verdict. The court denied

both motions and signed findings of fact and conclusions of law. Jordan appealed the trial court's determinations but Akin did not.

## Standard of Review

A parent's rights to the "companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex.2003). A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). Termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* However, "the rights of natural parents are not absolute" and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex.2003). Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

Proceedings to terminate parental rights under the Family Code require proof by clear and convincing evidence. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2009); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex.2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re J.O.A.*, 283 S.W.3d at 344. When the legal suffi-

---

1. TEX. FAM.CODE ANN. § 161.001(1)(C), (D), & (E) (Vernon Supp.2009).

ciency of the evidence is challenged, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* To give appropriate deference to the factfinder's conclusions, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not mean that a court must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. *Id.* at 344–45.

When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review. *Id.* at 345. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

### Credibility of Witnesses

Because the credibility of witnesses is a matter pertinent to each of the grounds for termination, we begin by addressing the trial court's findings that the trial testimony by Jordan lacked credibility and the trial testimony by the other witnesses who testified either at trial or by deposition was credible.

The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex.2005). When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *See id.* at 820. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its legal sufficiency review. *See id.* at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier of fact must be allowed to do so. *See id.* at 822. So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *See id.*

In its finding of fact number eight, the trial court stated, "The testimony by Carrie Jordan as presented at trial was inconsistent and not credible." The record shows Jordan's trial testimony is often inconsistent with the testimony of other witnesses, documents in evidence, and her own former statements. In the following section we examine for credibility her assertions that pertain to each of the grounds for termination found by the trial court. Jordan claims (A) her mental condition escalated when her relationship with Akin suddenly changed when Akin failed to arrive in September 2007 to take her to the house he had renovated for her, (B) she never consented for R.A. to be initially placed with Akin, and (C) even if she did initially consent for R.A. to be placed with Akin, she did not consent for

R.A. to remain with Akin beyond that initial period of time. The trial court found these contentions lacking in credibility, and we conclude in section (D) that the record supports the trial court's credibility determination.

## A. Change in Mental Condition Due to Change in Relationship

■ According to Jordan's trial testimony, she started having suicidal ideations when Akin suddenly failed to appear in September 2007 after telling her that he had renovated a house for them to move into together as a family. For several reasons, the record does not support that theory.

First, at trial, Jordan paints a picture of surprise at Akin's failure to appear when he said he would, suggesting that their relationship was fine before that. It is undisputed, however, that Jordan started living in the Rose Home, a shelter for pregnant women with mental illnesses, because Akin was unemployed and unable to support them. During the period of time Jordan lived with Akin while she was pregnant, they did not have a permanent residence. At times, they lived in "crack houses." At other times, they moved from house to house because Akin would get into an altercation with someone where they were staying and they would then be required to leave the residence. In describing Akin, Jordan said he "always liked to live in neighborhoods where there were severe drug problems and prostitution." A handwritten note by Jordan stated, "While I was pregnant, James did not work, or if he did, he didn't hold a job very long." She acknowledged that while she was with Akin when she was pregnant she did not receive proper nutrition due to their instability. The undisputed evidence shows Jordan was aware of Akin's financial and personal instability.

Second, Jordan's trial testimony suggests that after she moved into the Rose Home, Akin was interested in pursuing a relationship with her and her baby and visited her often, so that she was surprised by his failure to pick her up to take her to their renovated home. But according to Davis, Akin did not visit often and appeared uninterested in Jordan. Deferring to the trial court's credibility determinations, the record shows Akin did not want to have a relationship with Jordan.

Third, medical records show Jordan has a long history of suicide attempts, having attempted suicide at least 10 to 15 times before she became pregnant with R.A. At trial, Jordan denied having attempted to commit suicide that many times, but the trial court found that testimony lacking in credibility. Deferring to the trial court's credibility determinations, Jordan had frequent suicide attempts throughout her life.

Fourth, although she acknowledges she knew Akin had certain faults, she denied at trial that she knew he was a convicted sex offender during the period of time when she was pregnant, and claims instead that she learned this information about Akin much later. Jordan presents this picture to explain her surprise at things she found out later about Akin. The record does not support this version. Aside from her trial testimony, the record shows that Special Agent Phill wrote in a 2008 report that Jordan told him, "[she] first became aware [that] Akin was a registered sex offender after a verbal domestic argument on May 2, 2006 . . . ." At trial, Special Agent Phill further testified by deposition that Jordan told him "that the first time she found out that he was a registered sex offender was after they had a domestic altercation." The trial court could reasonably have determined that Jordan knew Akin was a convicted sex offender at the

time of the domestic altercation when she was pregnant with R.A.

Although at trial Jordan presents a picture of a person shocked by the sudden disappearance of a person who she then called a "husband," the trial court could reasonably have rejected that testimony as lacking in credibility. The trial court could have reasonably determined from the evidence it found credible that Jordan was not surprised by Akin's failure to renovate a house for them because he had no financial means to renovate a house, he was too personally unstable to commit to that type of task, and he was not interested in pursuing a relationship with her. Furthermore, Jordan knew that Akin was not reliable because he was often kicked out of houses where he would try to stay, he was often arrested, and he was a convicted sex offender. The trial court could reasonably have rejected Jordan's explanation about the attempted suicide in September 2007 when she was eight-months pregnant with R.A. as lacking in credibility.

## B. Initial Placement of R.A. with Akin

Jordan contends that she did not knowingly place R.A. with Akin because Akin initially took R.A. from her without her consent. In this section, we focus on a three-week period of time when R.A. initially began living with Akin from about November 24, 2006, when Jordan states Akin took R.A. just before Thanksgiving, to December 16, when Jordan was ousted from the Rose Home.

The sole evidence that Akin's initial possession of R.A. was without Jordan's consent comes from Jordan's trial testimony that the trial court determined lacked credibility. Excluding her trial testimony from consideration, and deferring to the trial court's determination about the credibility of the evidence, the record shows

that Jordan voluntarily relinquished R.A. to Akin, who did not want a relationship with them. From the time of R.A.'s birth, Akin was not interested in him. Akin did not go to the hospital when R.A. was born, and when Davis took Jordan to see Akin within a few days of R.A.'s birth, Jordan was "begging" him for attention. Akin did not come to see Jordan at the Rose Home at any point after R.A.'s birth.

The trial court expressly found in its findings of fact number six that Jordan "did not" ask Akin "to return the child to her at that time," referring to December 2006. The trial court also found that Jordan told Davis that R.A. was " 'okay' with his father." The record shows Davis suggested to Jordan that she should take R.A. back from Akin; however, Jordan "assured [her] that it was okay, that [Akin]— no matter how he was with her, he was very good with children." Davis testified that although her memory of the conversation was not completely clear, she knew "for a fact that [she] encouraged [Jordan] to bring the baby back and [Jordan] was reluctant to do so." Davis further stated, "[Jordan] seemed to want [Akin] to have the baby." Davis said it appeared to her that Jordan wanted Akin to have R.A. so that they could reunite as a family. Davis's recollection about Akin's lack of interest in R.A. is supported by Akin's version of the events. The letter from Akin to Jordan mentions that Akin did not want to have custody of R.A. but was "stuck" with him when Jordan refused to care for R.A. and disappeared.

Jordan contends her actions to regain custody of R.A. after R.A. began to live with Akin show that she did not consent to the situation. Jordan claims that soon after R.A. began living with Akin, in the period of time from late November to December 16, 2006, she contacted police officers, Legal Aid, and private attorneys, and

tried to raise funds to hire an attorney. Other than Jordan's trial testimony, no evidence shows she contacted the police, Legal Aid, or attorneys, or tried to raise funds to hire an attorney. More specifically, Officer Feskanich testified that he could not find any report concerning R.A., which he would expect would have been generated if someone had complained that a child was in danger. Legal Aid responded to Jordan's June 2007 request for assistance, which is the only evidence in the record concerning any contact between them and Jordan. Concerning Jordan's trial testimony that she tried to contact private attorneys and tried to raise funds to hire an attorney, no evidence shows this, other than her trial testimony. Furthermore, Davis testified that Jordan was not interested in going to retrieve R.A. and it appeared to Davis that Jordan consented to Akin's possession of R.A.

Although she refers to her statements in medical records calling the case a kidnapping, other statements in those same medical records contradict that position. Jordan's reaction to Akin's initial possession of R.A. was described by Jordan herself, as recorded in a medical record dated December 28, 2006, which states,

> She has delivered her young son in November of this year and there has been *some difficulties with her ability to keep the child.* She had been staying at the Rose Home with the infant, but states that she got angry there and was asked to leave the Rose Home. *As such, she was unable to keep her young son, so her husband currently has the child and is living with a family that she is unable to live with as they do not want her there.* She states, "They think I am crazy."

(Emphasis added.) Deferring to the trial court's credibility determinations, the record shows Jordan voluntarily placed R.A.

with Akin in late November to December 16, 2006.

## C. Allowing R.A. to Remain with Akin

In this section, we address the period of time from December 16, 2006 to September 2007.

### 1. Jordan Spent Approximately 25 Days Seeking Assistance from DHS from December 21, 2006 to January 10, 2007

The medical records document that Jordan was in communication with DHS workers from December 21, 2006 to January 10, 2007. On December 21, 2006, the medical records show that Jordan was "concerned about child's welfare and in touch with multiple people regarding her child." The record also states that Jordan "had a child welfare employee come visit her." Medical records dated January 10, 2007 state,

> [DHS] investigator says that the father does live with roommates, has no job, but the house and circumstances meet appropriate environmental standards for the child. At this time, the investigator says that she is finished with both parties and patient does not need to keep contacting her. She has an open case, but no further action will be taken.

The medical records show that the DHS worker said that Akin stated he did not want to be with Jordan because he could not handle her "destructive behavior."

Jordan suggests that her contact with DHS shows she did not allow R.A. to remain with Akin, but the record fails to support that assertion. Instead, the records show Jordan was focused on obtaining DHS's assistance to find her a place to live with Akin and R.A. The medical records for this period of time show that Jordan was attempting to have DHS inter-

vene to help find a place for Jordan, Akin, and R.A. to live together as a family. The medical records show Jordan "want[s] the case worke[r] to help us find a place where we can all be together, a place for families. I don't want my baby or us on the street, especially one week before the holidays." Another medical record states, "She also wanted to talk to social worker so that a placement can be found for her husband and her...." The medical reports also document that Jordan was "vague, unclear about why [Jordan] cannot be with husband and child." Furthermore, the medical records for January 5, 2007 state,

> Patient wanting to talk with her husband to check on their baby and to see if he will pick up her and the baby's belongings at the shelter where she was staying. Reports he told her he had brought her a new wedding ring. Reports she really does not know what he is thinking but hopes he is sincere in working towards them being a family together.

When DHS became involved, its concern was to determine whether Akin had a suitable environment for R.A. Nothing in the record indicates that Jordan told DHS that she had seen blood and bruises on R.A., that Akin had been physically abusive towards her when she was pregnant with R.A., or that Akin was a convicted sex offender. Having no information about Akin's history and requests focused on having them find a place for Jordan to live with Akin and R.A., DHS decided to take "no further action" after its snapshot view of Akin's residence and circumstances.

At most, Jordan has shown that she was in contact with DHS for a 25–day period of time and that DHS found that R.A.'s living situation was suitable during that short period they were involved. The trial court could reasonably have determined that this contact with DHS was inconsequential in

this case because Jordan did not give DHS the pertinent information about Akin's background and its assessment was based on a snapshot view of R.A.'s circumstances.

Additionally, after January 10, 2007, when Jordan learned DHS would take no further action, Jordan made no effort to have DHS further investigate Akin. Jordan acknowledged at trial that she believed the DHS worker's assessment was erroneous, and that she believed Akin had R.A. in a "bad environment." Jordan testified at trial that although the DHS worker reported that R.A. was not in danger with Akin, Jordan disagreed with that conclusion. Although she did not believe "it was a good investigation," Jordan took no further steps to pursue another DHS investigation and never contacted DHS again after January 10, 2007. This was unreasonable because Jordan knew that, at best, DHS got a snapshot view of R.A.'s environment, which would likely change within a short period of time, given that Akin was a transient, usually unemployed, usually ejected from the places he lived, violent, a convicted sex offender, unreliable, uninterested in having a relationship with R.A., and could not provide proper nutrition to those in his care. The trial court could reasonably have determined that Jordan knew the DHS investigation was inadequate because she did not give the worker pertinent information for her to make an accurate assessment and Akin's transient lifestyle would produce a different environment for R.A. within a short period of time.

## 2. After DHS Ended Its Investigation, Jordan Knowingly Allowed R.A. to Remain with Akin from January 10 to September 2007

Jordan contends that after DHS ended its investigation on January 10, Akin con-

tinued to have R.A. without her consent from January 10 to September 2007. She points to medical records that include her references to Akin's possession as a "kidnapping" and claims that she made efforts to regain custody of R.A. during that period of time.

In the trial court's seventh finding, the court found:

> Prior to March 2008, there was no evidence offered by [Jordan] that she earnestly attempted to locate or retrieve the child after relinquishing him to [Akin] in November 2006 despite being advised to do so and despite offers of help to do so from Oklahoma Legal Aid.

The record supports the trial court's finding that Jordan did not earnestly attempt to locate or retrieve R.A., but it does not support the date of March 2008 and instead it supports the earlier date of September 2007 when Jordan began calling various police agencies. We have already discussed the period of time from approximately November 24, 2006, when R.A. began living with Akin, to January 10, 2007, when DHS was involved in the case. We, therefore, focus on the period of time when R.A. remained with Akin from January 10, 2007, when DHS ended its investigation, to September 2007, when Jordan contacted several police agencies inquiring about R.A. In examining the period of time from January 10 to September 2007, we examine Jordan's (a) medical records, (b) assertions that she contacted police (c) reasons for not pursuing a civil lawsuit, and (d) assertion that she did not know where Akin was.

### a. Medical Records

Although Jordan asserts the medical records support her position that Akin had R.A. without her consent for the period of time before September 2007, her statements in the medical records are inconsistent. Jordan's statements documented in the medical records range from one extreme, in which she claims Akin kidnapped R.A., to the opposite extreme, in which she states that Akin is nice, that he is taking care of R.A. while she is unable, and that she wants case workers to help find a place for Akin, Jordan, and R.A. to live together as a family. For example, in the same emergency report where Jordan uses the word "kidnapped," she quickly explains that Akin "threatened to go to court and get custody" and that he would get a protective order, which are both actions that appear to be inconsistent with a kidnapping.

After DHS ended its investigation of Akin, the medical records suggest Jordan consented to Akin having possession of R.A. OU medical records dated January 14, 2007 state, "She did write a letter to her husband asking that he bring her 3 mo[nth] old son to see her. Also told him she did not like where her husband is living. . . . She describes her mood as 'great . . . I've never felt this good in my life.'" The medical records contain inconsistent statements concerning whether Akin's possession of R.A. was with or without Jordan's consent. We, therefore, must defer to the trial court's determination that Jordan knowingly and voluntarily let R.A. remain with Akin.

### b. Contact With Police

The medical records show that on January 9, 2007 Jordan said she was "contemplating" calling the police. The record next states, "When asked for what reasons is she justified in calling the police, she didn't say and changed the subject. [The writer of the note] offered to help in any way." Nothing in the medical records show Jordan made contact with police when she was hospitalized.

Jordan contends that in "mid to late" summer of 2007 she contacted Logan County authorities, who informed her Akin was a noncompliant sex offender who had failed to register in Minnesota, and then she contacted the Oklahoma police, who sent Officer Robert Townsend to meet her at the Standers Estate. Other than her trial testimony, no evidence shows she contacted these authorities at this point in time. Special Agent Phill testified that when he first came into contact with her in March 2008, he spoke to Oklahoma City police officers who did remember talking to her, but he did not specify when that contact between Jordan and those officers occurred. According to Detective Feskanich, the first report to the Oklahoma police was in January 2008. Feskanich testified that he believed that if Jordan had tried to contact the police before January 2008, the police would have generated a report because a report would be made if a child were in danger. Other than Jordan's claims at trial that she contacted the police who refused to assist her, no other evidence in the record supports her position that she contacted any police agency prior to September 2007. Based on its credibility assessment of the evidence, the trial court could reasonably have determined Jordan did not seek police assistance until September 2007.

### c. Reasons for Not Pursuing Civil Lawsuit

Jordan asserts she sought to retain an attorney but could not afford one during that period of time. The only evidence to support that claim is Jordan's trial testimony. Nothing in the medical records mentions Jordan trying to hire an attorney. Moreover, evidence that Jordan received a lump sum disability payment late in the summer of 2007 and spent the money on things such as furniture is strong impeachment of Jordan's claim that her

lack of an attorney was due to a financial inability.

Jordan contends she tried to obtain R.A. by seeking the assistance of Legal Aid during the first seven months of R.A.'s life. In June 2007, Legal Aid sent a letter declining representation. This document is the sole evidence about Jordan's contact to Legal Aid, aside from her testimony at trial. However, for two reasons, the trial court could reasonably have determined that Jordan's actions in June 2007 were not earnest attempts by her to locate or retrieve R.A. First, Jordan refused the assistance from Legal Aid. Legal Aid offered to draft all documents that would be required for Jordan to petition the court for custody of R.A. Jordan testified that she did not sign the contract for these services because she did not think she should represent herself. Although self-representation is usually unwise, Jordan was offered some limited legal assistance by Legal Aid to assure that the paperwork would be adequate. Jordan opted to do nothing rather than accept some help to regain custody of R.A.

Second, shortly after Legal Aid had offered to draft the paperwork for Jordan, she received almost $7,000 in a lump sum disability payment that she decided to use for material things other than pursuing legal action. In light of Jordan's decision not to pursue legal action when she had the funds to do so, the trial court could reasonably have determined based on its credibility assessment of the evidence that the reason Jordan did not pursue the lawsuit in the summer of 2007 was because she did not desire to obtain custody of R.A. at that time, and not because she was denied complete representation by Legal Aid.

### d. Ability to Locate Akin

Jordan contends she did not knowingly allow R.A. to remain with Akin because

she did not know where Akin was after DHS closed its case in January 2007. The record does not support that contention.

The medical records show that Jordan knew where Akin was living in January 2007. Jordan gave DHS Akin's address, where they found him around January 10. On January 14, according to medical records, Jordan said she wrote a letter to Akin asking him to bring R.A. to see her and telling him that she did not like where he was living. These same medical records show that on January 17 Jordan stated that Akin resided "in a home off of 7th and McKinley in Oklahoma City and fears that this home is conducive to illicit drug activity."

The record shows Jordan knew how to find Akin in the first seven months of 2007. Jordan testified at trial that she communicated with Akin in July 2007 when he asked her to mail him R.A.'s social security card, which she says she did. Detective Feskanich's testimony is consistent with that evidence. He said that when he interviewed Jordan in January 2008, she told him that when she was living at the Hope Center, she knew where Akin and R.A. had been living in Oklahoma City. Jordan told Detective Feskanich that the reason she did not go and make "contact" with Akin and R.A. was because she "had curfew." The trial court could reasonably have determined that Jordan's claim that she did not know where Akin was after January 2007 lacked credibility.

Through its assessment of the credibility of the evidence, the trial court could reasonably have determined Jordan voluntarily and knowingly allowed R.A. to remain with Akin by deciding not to earnestly attempt to retrieve R.A. from January 10 to September 2007.

**D. Record Supports Trial Court's Credibility Determination**

In light of Jordan's many inconsistencies in the various versions of the events, the trial court's finding that Jordan's trial testimony lacked credibility is supported by the record, and we must defer to that determination. *See id.* Although the trial court disbelieved Jordan, it found the other witnesses credible. The witnesses were Jerry and Pam Dossey; Cravens, the expert; Davis, the manager of the Rose Home; Detective Feskanich; and Special Agent Phill. From our review of the record, the trial court's finding that these witnesses were credible is within the zone of reasonable disagreement, and therefore we defer to the trial court's determination. *See id.* In reviewing each of the grounds for termination of Jordan's parental rights found by the trial court, we do so under the prism of its findings of credibility of the witnesses.

### Statutory Grounds for Termination

In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the party wishing to terminate rights must establish two things. First, the party must prove that one or more acts or omissions enumerated in one or more of the subsections of section 161.001(1) occurred. *See* TEX. FAM.CODE ANN. § 161.001(1); *In re J.L.*, 163 S.W.3d 79, 84 (Tex.2005); *Liu v. Dep't of Family and Protective Servs.*, 273 S.W.3d 785, 790 (Tex.App.-Houston [1st Dist.] 2008, no pet.). Second, the party must prove that termination of the parent-child relationship is in the best interest of the child. *See* TEX. FAM.CODE ANN. § 161.001(2); *In re J.L.*, 163 S.W.3d at 84; *Liu*, 273 S.W.3d at 790. In termination proceedings, the fact finder must find that both elements are established by clear and convincing evidence. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). Termination may not be based solely on

the best interest of the child. *Id.; Liu*, 273 S.W.3d at 790.

### Grounds for Termination Under Section 161.001(1)

Jordan challenges the legal and factual sufficiency of the evidence to support each of the three grounds found by the trial court under section 161.001(1). *See* TEX. FAM.CODE ANN. § 161.001(1). The trial court determined that Jordan violated sections C, D, and E of section 161.001(1). *See* TEX. FAM.CODE § 161.001(1)(C), (D), & (E). We address each section separately. Although termination may be based on the best interest of the child in addition to one ground under section 161.001(1), we conclude the evidence is legally and factually sufficient for each of the three grounds found by the trial court.

#### A. Endangering by Placing or Allowing Conditions (Section D)

##### 1. Applicable Law

▮▮▮▮ The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(D) (Vernon Supp.2009). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the "conditions or surroundings" of the child's home under section D. *In re C.L.*, No. 2–09–126–CV, 2009 WL 3078588, at *2 (Tex.App.-Fort Worth Sept. 24, 2009, no pet.) (mem. op., not designated for publication). When termination of parental rights is based on section D, the endangerment analysis focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex.App.-Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.*, 955 S.W.2d 364, 367 (Tex.App.-San Antonio 1997, pet. denied).

▮▮▮▮ It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (citing *In re Tidwell*, 35 S.W.3d 115, 119–20 (Tex.App.-Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by ... leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.-Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d at 367.

##### 2. Analysis

▮▮▮ Deferring to the trial court's credibility determinations, Jordan caused several circumstances that physically and emotionally endangered R.A. by placing him and allowing him to remain in the sole care of Akin. First, she knew that Akin

was violent, abusive, had endangered R.A. as a fetus when Akin physically abused her, and was often incarcerated for violent conduct. *See In re J.M.M.*, 80 S.W.3d 232, 241–42 (Tex.App.-Fort Worth 2002, pet. denied) (holding evidence legally and factually sufficient under sections D and E to terminate mother's parental rights based in part on evidence that mother placed children with physically abusive father).

Second, Jordan knew Akin was a convicted sex offender, who usually lived near criminals and drug addicts, and who lived a transient lifestyle. *See id.* (holding evidence legally and factually sufficient under sections D and E to terminate mother's parental rights based in part on evidence that mother placed children with father, who lived transient lifestyle with children); *Hann v. Tex. Dep't of Protective & Regulatory Servs.*, 969 S.W.2d 77, 82–83 (Tex. App.-El Paso 1998, pet. denied) (holding evidence legally and factually sufficient under sections D and E to terminate mother's parental rights based in part on evidence that mother endangered child's physical and emotional well-being by leaving child alone overnight with known cocaine abusers).

Third, Jordan knew Akin was not interested in having a relationship with R.A., would not provide adequate nutrition for R.A., and had no means to financially support R.A. due to Akin's perpetual unemployment. *See In re T.T.*, 39 S.W.3d 355, 362 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (holding evidence supported terminating mother's parental rights under section D based in part on evidence that mother could not adequately protect or provide financially for children).

There is sufficient evidence that shows Jordan was aware of the potential for the environment to endanger R.A. *See In re S.M.L.*, 171 S.W.3d at 477. Although section D does not require proof of actual harm, the evidence here shows R.A. was actually harmed by living in the circumstances provided by Akin after Jordan voluntarily relinquished custody of R.A. to Akin. The trial court found that when Jerry took R.A. to live with him, R.A. was found alone in a residence, in deplorable conditions, with no clothing or personal belongings, covered in feces, with his penis fused to his scrotum, covered in scabies, with developmental delays, a Vitamin D deficiency, no ability to crawl or walk, suffering from night terrors, afraid of the bath tub and water, demonstrating sexually explicit behaviors, and unable to speak. Although she may not have known that R.A. would get these particular injuries from the circumstances of placing R.A. with Akin, Jordan knew that these types of injuries or much worse were the probable result of the circumstances of leaving a baby in the custody of Akin. *See id.*

The single act of placing R.A. with Akin under any of these circumstances permits termination under section D. *See In re R.D.*, 955 S.W.2d at 367. Here, however, the evidence shows that Jordan not only placed R.A. in these circumstances, but she voluntarily and knowingly allowed R.A. to remain in the circumstances without making any earnest effort to remove him from them.

### 3. Conclusion

Viewing all the evidence in the light most favorable to the judgment, we hold a fact-finder could reasonably have formed a firm belief or conviction that Jordan knowingly placed and knowingly allowed R.A. to remain in conditions and surroundings that endangered his physical and emotional well-being. *See* TEX. FAM.CODE ANN. § 161.001(1)(D). The evidence is thus legally sufficient to support the trial court's termination findings under section 161.001(1)(D) of the Family Code. *See id.;*

*In re J.T.*, No. 13–08–00652–CV, 2009 WL 2077184, at *13 (Tex.App.-Corpus Christi July 16, 2009, no pet.) (mem. op., not designated for publication) (holding evidence that mother allowed child to remain in home in which there was violent conduct, as evidenced by father's physical abuse of mother during her pregnancy, was legally sufficient to support termination) (citing *In re H.C.*, 942 S.W.2d 661, 665 (Tex.App.-San Antonio 1997, no writ)) (holding evidence legally sufficient under sections (D) and (E)).

Viewing the evidence as a whole, we hold a rational trier of fact could have reasonably formed a firm belief or conviction that Jordan knowingly placed and knowingly allowed R.A. to remain in conditions and surroundings that endangered his physical and emotional well-being. Thus, the evidence is factually sufficient to support the trial court's finding on the section 161.001(1)(D) ground. *See* TEX. FAM.CODE ANN. § 161.001(1)(D); *In re J.T.*, 2009 WL 2077184 at *13 (holding evidence that mother allowed child to remain in home in which there was violent conduct, as evidenced by father's physical abuse of mother during her pregnancy, was factually sufficient to support termination).

**B. Endangering by Engaging in Conduct (Section E)**

**1. Applicable Law**

 The trial court must find by clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon Supp.2009). The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *In re R.D.*, 955 S.W.2d at 368. Termination un-

der section E must be based on more than a single act or omission; what is required is a voluntary, deliberate, and conscious course of conduct. *In re J.J.S.*, 272 S.W.3d 74, 78 (Tex.App.-Waco 2008, pet. struck). The conduct does not have to occur in the presence of the child. *See Dir. of Dallas County Child Protective Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex.App.-Dallas 1992, no writ). To determine whether termination is necessary, courts look to parental conduct both before and after the child's birth. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex.App.-Fort Worth 2003, no pet.).

 "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (citing *Boyd*, 727 S.W.2d at 533). The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Id.* (quoting *Boyd*, 727 S.W.2d at 533). However, danger to a child need not be established as an independent proposition and may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury. *See id.; Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 195 (Tex.App.-Houston [1st Dist.] 2005, pet. denied).

 Conduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied). A parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *In re J.I.T.P.*, 99 S.W.3d

841, 845 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *see also In re C.M.B.*, 204 S.W.3d 886, 895 (Tex.App.-Dallas 2006, pet. denied). A parent's mental instability and attempt to commit suicide may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d at 126; *see In re A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.-Waco 1999, no pet.) (upholding jury's determination of endangerment where evidence showed mother's suicidal thoughts, suicide attempts, and neglect); *see also In re C.D.*, 664 S.W.2d 851, 853 (Tex.App.-Fort Worth 1984, no writ) (mental conditions and suicide attempts of parent were factors in considering whether parent engaged in conduct that endangered emotional well-being of child).

Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child. *In re B.R.*, 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied). Evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section E has been established. *In re D.T.*, 34 S.W.3d 625, 636–37 (Tex.App.-Fort Worth 2000, pet. denied). Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future. *Schaban–Maurer v. Maurer–Schaban*, 238 S.W.3d 815, 824 (Tex.App.-Fort Worth 2007, no pet.); *see In re M.G.M.*, 163 S.W.3d 191, 202 (Tex.App.-Beaumont 2005, no pet.).

### 2. Analysis

The trial court made findings pertaining to section 161.001(1)(E) in support of its determinations that (a) Jordan knowingly placed and allowed R.A. to remain with Akin, who engaged in conduct that endangered R.A.'s physical or emotional well-being, and (b) Jordan herself engaged in conduct that endangered R.A.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E).

#### a. Placing and Allowing R.A. to Remain with Akin

For the same reasons detailed in our analysis of section D, we conclude the evidence supports the trial court's determination that Jordan's voluntary and knowing placement of R.A. with Akin and her voluntary and knowing decision to allow R.A. to remain with Akin by opting not to use earnest efforts until after September 2007 to regain custody of R.A., endangered the physical and emotional well-being of R.A. *See In re S.P.*, 168 S.W.3d 197, 204–05 (Tex.App.-Dallas 2005, no pet.) (holding evidence supported termination of mother's parental rights where, among other factors, mother knowingly allowed abusive and sexually deviant father to have access to children); *In re J.M.M.*, 80 S.W.3d at 241–42; *Hann*, 969 S.W.2d at 82–83.

#### b. Jordan's Direct Contact with R.A.

In this section, therefore, we address Jordan's direct conduct that endangered R.A. Deferring to the trial court's credibility determinations, the record supports the trial court's findings that Jordan engaged in conduct which endangered the physical or emotional well-being of R.A. for several reasons. First she endangered him when he was a fetus. *See id.* at 203 (endangering conduct may include parent's actions before child's birth); *In re S.M.L.D.*, 150 S.W.3d 754, 757–58 (Tex.App.-Amarillo 2004, no pet.); *Avery v. State*, 963 S.W.2d at 553. Although she obtained prenatal care in the latter half of her pregnancy, Jordan did not receive proper nutrition for most of her pregnancy due to her decision to leave the shelter to be with Akin. *Com-*

pare *Mann v. Dep't of Family & Protective Servs.*, No. 01–08–01004–CV, 2009 WL 2961396, at \*11 (Tex.App.-Houston [1st Dist.] Sept. 17, 2009, no pet.) (mem. op., not designated for publication) (considering under section E that mother took prenatal vitamins as evidence that undermined argument that she engaged in course of conduct that endangered child). In addition to failing to properly care for R.A. for the entire time he was a fetus, Jordan also tried to end his existence by attempting suicide when he was an eight-month fetus. This deliberate conduct endangered R.A. physically before he was born. *See In re A.M.C.*, 2 S.W.3d at 716 (finding endangerment from mother's suicidal ideations, attempts and neglect). Jordan also physically endangered R.A. before he was born by remaining with Akin, who was repeatedly physically abusing her to the point that she knew he was endangering R.A. as a fetus. *See In re J.T.*, 2009 WL 2077184 at \*12 (holding evidence legally and factually sufficient to terminate mother's parental rights under section E for endangering physical well-being of child based in part on evidence that mother remained with physically abusive person while she was pregnant); *see also In re J.I.T.P.*, 99 S.W.3d at 845 (holding trial court could have properly considered the domestic violence and physical altercation during mother's pregnancy as evidence of endangerment).

Second, Jordan has lived an unstable, transient lifestyle that indicates a pattern of engaging in conduct that would endanger R.A. emotionally and physically. *See Bowling*, 833 S.W.2d at 733 (conduct does not have to occur in presence of child and can be considered even if child living elsewhere at time of events). Between December 2006 and September 2007, she was kicked out of the Rose Home shelter for violent conduct, she then attempted suicide, and then resided at various points in

time in a hospital, in a shelter, or was homeless. Although none of her conduct at that time was directed at harming R.A., endangering conduct is not limited to actions directed toward the child. *See In re J.I.T.P.*, 99 S.W.3d at 844 (endangering acts need not be directed at or actually cause injury to child). The trial court could reasonably determine that Jordan's propensity for violence against herself and others, want of self control, and transient lifestyle would endanger R.A. by giving him a life of instability and uncertainty. *See id.* at 845 (holding trial court could have considered mother's desire to hurt herself and her history of noncompliance with her medication schedule as factors endangering child); *In re N.S.G.*, 235 S.W.3d at 358, 367 (Tex.App.-Texarkana 2007, no pet.) (noting that if evidence shows course of conduct which has effect of endangering physical or emotional well-being of child, finding under section E is supportable); *see also In re J.J.S.*, 272 S.W.3d at 78 (requiring course of conduct under section E).

Jordan points to evidence that she had not attempted suicide for over a year, has not been hospitalized for over two years, and that her mental illness is in remission. Other than her trial testimony that the court found lacking in credibility, Jordan provided no evidence that her mental illness is in remission. The record shows Jordan was last hospitalized in January 2007; however, medical records from February through November 2008 repeatedly diagnose Jordan as still having "[m]ajor depressive disorder, recurrent, severe with psy[chotic] features, seizure disorder." Additionally, the record shows, and the court made findings, that Jordan was first diagnosed with major depression and personality disorder at the age of 15. Between 1996 and 2003, she was in and out of several mental health care facilities. She

has tried to commit suicide 10 to 15 times and has been hospitalized 20 times. She has been either homeless, in a shelter, in housing associated with a shelter, or in a hospital for most of R.A.'s life. Jordan is currently diagnosed with bi-polar disorder, major depression, chronic post-traumatic stress syndrome, and borderline personality disorder. At the time of trial, Jordan was not attending all of her mental health appointments, and she was not taking her medications as prescribed.

Although there are recent developments that show improvements in Jordan's condition, the trial court could reasonably determine any evidence of improvement was short lived and outweighed by the extent of her mental history over the course of most of her life, the number of suicide attempts, the number hospitalizations, her minimization of her present mental condition, and her present failure to strictly comply with her medication and therapy. *See In re J.I.T.P.*, 99 S.W.3d at 845 (considering in termination proceeding under section E that mother had recurrent depression, borderline personality disorder, post-traumatic stress syndrome, partial complex seizures, thoughts of suicide, and was not compliant with medications); *In re C.D.*, 664 S.W.2d at 853 (considering mother's schizophrenia and resulting suicidal thoughts, hospitalizations, and violence); *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (deferring to trial court to weigh evidence of significant recent improvements, especially of short duration, against probative value of irresponsible choices). Based on Jordan's past and present conduct, the trial court could reasonably infer that if R.A. lived with her in the future, her instability would physically and emotionally endanger him by giving him a life of uncertainty. *See Schaban–Maurer*, 238 S.W.3d at 824; *In re M.G.M.*, 163 S.W.3d at 202.

### 3. Conclusion

Viewing all the evidence in the light most favorable to the judgment, we hold a fact-finder could reasonably have formed a firm belief or conviction that Jordan knowingly placed and allowed R.A. to remain with persons who engaged in conduct that endangered the physical and emotional well-being of R.A., and Jordan engaged in conduct that endangered the physical and emotional well-being of R.A. *See* Tex. Fam. Code Ann. § 161.001(1)(E). The evidence is thus legally sufficient to support the trial court's termination findings under section E. *See In re J.I.T.P.*, 99 S.W.3d at 845.

Viewing the evidence as a whole, we hold a rational trier of fact could have reasonably formed a firm belief or conviction that (1) Jordan knowingly placed and allowed R.A. to remain with persons who engaged in conduct that endangered the physical and emotional well-being of R.A., and (2) Jordan engaged in conduct that endangered the physical and emotional well-being of R.A. *See* Tex. Fam.Code Ann. § 161.001(1)(E). Thus, the evidence is factually sufficient to support the trial court's termination findings under section E. *See In re J.I.T.P.*, 99 S.W.3d at 845.

### C. Failing to Support for Six Months (Section C)

#### 1. Applicable Law

 The court may terminate the parent-child relationship if the court finds by clear and convincing evidence that the parent has left the child alone or in the possession of another without providing adequate support for the child and remained away for a period of at least six months. *See* Tex. Fam.Code Ann. § 161.001(1)(C) (Vernon Supp.2009). This ground is commonly characterized as the abandonment of a child by a parent. *See*

*In re J.R.*, No. 08–08–00058–CV, 2010 WL 375676, at *3 (Tex.App.-El Paso Feb. 3, 2010, no pet.); *In re T.B.D.*, 223 S.W.3d 515, 518 (Tex.App.-Amarillo 2006, no pet.). The six-month period is a period of at least six consecutive months. *See In re T.B.D.*, 223 S.W.3d at 518.

### 2. Analysis

The trial court made findings of fact pertinent to section 161.001(1)(C) that Jordan gave three week old R.A. to Akin; that she took "no steps to seek his return through civil court proceedings until around October 2008"; that she provided no support, goods, or money for the child after November 24, 2006; that she did not make adequate arrangements for the support of the child when she relinquished possession of the child to Akin in November 2006; and that she relinquished the child to Akin who had no job, no residence, and no visible means to support himself or the child. Deferring to the trial court's credibility determinations, the record supports these findings. These findings and the record establish that Jordan voluntarily placed R.A. in the possession of Akin, she did not provide any support to R.A., and she voluntarily remained away for a period of at least six months from November 24, 2006 to September 2007.

It is undisputed that Jordan has never provided any support of any kind to R.A. since he was three weeks of age. We have already detailed above the evidence that shows Jordan voluntarily placed R.A. with Akin on approximately November 24, 2006 and voluntarily left him with Akin until she tried to seek assistance from the police after September 2007. We have also noted she knew where Akin was until September 2007. The evidence, therefore, shows that although she knew where R.A. was, she did not support R.A. in any way for at least nine months.

Even if we exclude the period of time when DHS investigated the situation, DHS closed its case on January 10, 2007. Beginning January 10, Jordan did not support R.A. in any way from then through at least six months to July 10, 2007. We note that the record shows that on June 20, 2007, Legal Aid sent a letter to Jordan declining full representation, but offering to draft documents. As we have observed above, the trial court could reasonably have determined that was not an earnest effort by Jordan to regain custody of R.A. Excluding the time of the DHS investigation, Jordan failed to provide any support to R.A. for six months from January 10 to July 10, 2007.

Jordan relies upon *Holick v. Smith* to assert she does not herself need to provide support. 685 S.W.2d 18 (Tex.1985). In *Holick*, the mother of two children had difficulties caring for the children and eventually left the children with her niece to be cared for by the niece until the mother improved her living conditions. *Id.* at 19. After she left the children with the niece, she moved to another city and obtained employment. *Id.* She did not send money to help support the children, but the niece did not expect her to do so. *Id.* The mother did not visit or write the children for over six months, although she did call and talk to them once during that period, and expressed an intent to return for the children. *Id.* at 19, 20. The niece eventually sought termination of the mother's rights, and the trial court terminated the mother's rights under section C. *Id.* On appeal to the Texas Supreme Court, she contended that she was not required to actually support the children, but only make arrangements for their adequate support. *Id.* at 21. The Supreme Court agreed. It held the mother was required to "make arrangements for the adequate support" rather than personally support

the children, and concluded that the mother had met this standard. *Id.*

In this case, Jordan did not make "arrangements for the adequate support" of R.A. Excluding the testimony of Jordan, the evidence shows that she initially relinquished R.A. to Akin, an abusive man and convicted sex offender who lived a transient lifestyle. After DHS closed its case on January 10, 2007, Jordan did not try to regain possession of R.A., did not again contact DHS, and did not ensure that Akin was adequately supporting R.A. even though she knew the location of Akin and R.A. Additionally, unlike in *Holick*, there was no understanding between Akin and Jordan that Jordan would not be sending support because Akin could provide adequate support on his own. As Akin said in his own letters, Jordan "stuck" R.A. with him, she "never once helped [him] when [he] had [R.A.]," he "tried for almost 6 month[s]" to locate Jordan but she "vanished off the face of the earth," and he needed her "more than ever at that time and so did [R.A.] [b]ut [p]oof [she] vanished." The evidence clearly shows that Jordan did not make arrangements for the adequate support of R.A. *Cf. In re R.N.G.*, No. 11-02-00084-CV, 2002 WL 32344622, at *2 (Tex.App.-Eastland Dec. 12, 2002, no pet.) (mem. op., not designated for publication) (holding evidence insufficient to terminate mother's parental rights under section C because mother made arrangements for adequate support of children, evidence showed mother left children with father who maintained steady employment and adequately supported children, mother knew that father would provide adequate support, and mother left children pursuant to agreed divorce decree).

Jordan also relies upon *In re T.B.D.* to argue her rights should not be terminated. 223 S.W.3d 515. In *T.B.D.*, the father had attempted to contact the child from prison through correspondence. *Id.* at 519. The court found that although the father was incarcerated, there was insufficient proof of the "remaining away" requirement of section C, especially in light of the fact that the father attempted to contact the child. *Id.* The facts in this case are not analogous to those in *T.B.D.* As demonstrated above, apart from Jordan's testimony, the evidence shows that Jordan knew where R.A. and Akin were for the six-month period of time from January to June 2007, yet she did not go to see them. Her only explanation that she gave Detective Feskanich for not visiting them was that she had a curfew. Although an inmate's sole means to communicate with a young child is by letter, that type of communication is wholly inadequate when the person lives in the same city and is physically capable of maintaining personal contact with the child.

### 3. Conclusion

Viewing all the evidence in the light most favorable to the judgment, we hold a fact-finder could reasonably have formed a firm belief or conviction that Jordan failed to provide any support to R.A. for a continuous six month period of time. *See* Tex. Fam.Code Ann. § 161.001(1)(C). The evidence is thus legally sufficient to support the trial court's termination findings under section 161.001(1)(C) of the family code. *See id.*

Viewing the evidence as a whole, we hold a rational trier of fact could have reasonably formed a firm belief or conviction that Jordan failed to provide any support for R.A. for a continuous six month period of time. *See* Tex. Fam.Code Ann. § 161.001(1)(C). Thus, the evidence is factually sufficient to support the trial court's finding on the section 161.001(1)(C) ground. *See id.*

29

## D. Conclusion of Section 161.001(1) Analysis

Although only one ground under section 161.001(1) is required for termination of parental rights under that section, the trial court found three grounds, and we have determined the evidence is legally and factually sufficient to support each independent ground. *See In re J.L.*, 163 S.W.3d at 84 (stating that petitioner must establish only one ground listed under section 161.001(1)).

## Best Interest Finding

Having determined the evidence is sufficient to establish at least one of the grounds in section 161.001(1), we now consider the best interests of R.A.

### A. Applicable Law

■ Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See In re M.C.T.*, 250 S.W.3d 161, 170 (Tex.App.-Fort Worth 2008, no pet.) (citing Tex. Fam.Code Ann. § 263.307(a) (Vernon 2008)). There is also a strong presumption that a child's best interests are served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex.App.-Houston [1st Dist.] 2003, no pet.). Nevertheless, while parental rights are of constitutional magnitude, they are not absolute. *See In re C.H.*, 89 S.W.3d 17, 26 (Tex.2002). Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. *Id.*

■ In *Holley v. Adams*, the Texas Supreme Court provided a nonexclusive list of factors that the trier of fact may use in a termination case to determine the best interest of the child. 544 S.W.2d 367, 371–72 (Tex.1976). These factors include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* These factors are not exhaustive, and there is no requirement that the petitioner prove all factors as a condition precedent to parental termination. *In re C.H.*, 89 S.W.3d at 27; *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex.App.-Houston [1st Dist.] 2007, no pet.).

■ The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interests of the child. *In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. Evidence of just one factor may suffice as support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 27. However, termination of the parent-child relationship is not justified when the evidence shows merely that a parent's failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice. *Clark v. Dearen*, 715 S.W.2d 364, 367 (Tex.App.-Houston [1st Dist.] 1986, no writ).

### B. Analysis

■ We address the nine factors to determine whether the evidence is legally

and factually sufficient to show that termination of Jordan's parental rights is in the best interest of R.A.

### 1. Desires of Child

Regarding the first factor, because of R.A.'s youth, R.A.'s desires cannot be determined. This factor, therefore, is inconsequential in this case. *See In re M.T.*, No. 14–02–00973–CV, 2003 WL 22054247, at *2 (Tex.App.-Houston [14th Dist.] Sept. 4, 2003, no pet.) (mem. op., not designated for publication) (noting child of two years old too young to express her desires).

### 2. Emotional and Physical Needs Now and In Future, and

### 3. Emotional and Physical Danger Now and in the Future

The record shows that by the time of the trial, R.A. had not completely recovered from the circumstances he had lived under, but he was doing much better due to the care of the Dosseys. R.A. still stores food in his mouth when he eats, but he now enjoys taking a bath. The Dosseys have nurtured R.A. from his unhealthy condition to that of a healthy young boy developing verbal and motor skills, emotional attachment, and overcoming fears.

If R.A. was detached from the Dosseys, then he would face emotional harm. At trial, Cravens, an expert in child development, testified that after attachment has occurred a child cannot be moved without a measure of harm. She testified that a break in attachment and a move would likely impact R.A.'s ability to trust others and his ability to empathize with others when he is older. Cravens testified that it would be best not to break attachment at R.A.'s age, but if it must be broken to do it slowly and carefully. Despite acknowledging Cravens's testimony, Jordan testified at trial that she wanted to break R.A.'s attachment with the Dosseys and

that if awarded custody, she did not want the Dosseys to be a part of R.A.'s life.

Jerry testified that he tried multiple times to meet Jordan but she has refused to meet, as well as indicated an unwillingness to work with them regardless of what the court decides about R.A. Jordan's unwillingness to work with the Dosseys in making any necessary transition makes it probable that R.A. would be harmed by the break in the attachment he has with the Dosseys.

The trial court found that Jordan had placed her own needs above R.A. For example, after Jordan found out the Dosseys had possession of R.A., she did not attempt to contact them to find out how R.A. was doing or to send any support for R.A. or even a birthday card. Since then, however, Jordan has had some supervised visitation with R.A.

The Dosseys would serve well the emotional and physical needs of R.A. The Dosseys have been married for 13 years and have another child with whom R.A. has bonded. The evidence is undisputed that the Dosseys provide a stable home and that they will be able to continue to meet R.A.'s emotional and physical needs. The second and third factors weigh in favor of termination of Jordan's parental rights. *See Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.-Dallas 1995, no writ) ("The need for permanence is the paramount consideration for the child's present and future physical and emotional needs."); *see also* TEX. FAM.CODE ANN. § 263.307(a).

### 4. Parenting Abilities

Although Jordan had only a limited time with R.A., in that limited time she demonstrated weak parenting abilities. She attempted to commit suicide while pregnant with R.A. After R.A. was born, she allowed Akin to care for R.A. even though he had repeatedly abused her, had housed her in

crack houses, was a sex offender, and could not financially provide for food for her. As Jordan noted at trial, she has never taken care of a child full-time. She did take one online parenting class one week before trial, but has not taken other parenting courses since she was pregnant. At trial, Jordan testified that she had some experience taking care of children, but that testimony was inconsistent with her earlier statements produced during discovery.

The record shows Jordan has weak parenting abilities. It is undisputed the Dossey's have been excellent parents to R.A. The fourth factor, therefore, weighs in favor of termination of Jordan's parental rights. *See Castorena v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03–02–00653–CV, 2004 WL 903906, at *11 (Tex.App.-Austin April 29, 2004, no pet.) (noting "[i]t is not in a child's best interest that he be made a guinea pig" upon whom parents should be allowed to practice until they might become more proficient in child care).

### 5. Programs Available to Assist in Care of R.A.

Due to her diagnosis of epileptic seizures, Jordan receives governmental disability income of $674 per month to live on, albeit it would increase if she was awarded custody. Jordan has received food stamps for approximately one year. Jordan testified that she has an ability to take advantage of programs that could promote R.A.'s best interests. Jordan has no family in Oklahoma, and she complained of extensive abuse from her own mother and molestation from a family member, so it is unlikely she would be able to receive family support.

The financial resources that a stable family like the Dossey can provide could help pay for any social or counseling programs that R.A. may need in the future. The fifth factor neither weighs in favor of or against termination of Jordan's parental rights.

### 6. Plans for the Child, and
### 7. Stability of Home

Although Jordan testified she has plans to be a good mother to R.A., the record indicates she does not have the ability to be one. At trial, she admitted that if granted custody, she planned to prevent the Dosseys from seeing R.A., even in light of the expert's testimony that this could damage R.A.'s emotional stability. Furthermore, Jordan acknowledged at trial that her home was not suitable for a two-year-old.

The Dosseys intend to raise R.A. as their own child and adopt him. There is no dispute the Dosseys have provided R.A. with a stable home. Jerry testified that he and his wife, Pam, filed the lawsuit to terminate Jordan's rights because they consider R.A. to be their child who they love as part of their family, and whose best interest is served by living with them. Jerry said he and his wife paid an attorney to pursue the lawsuit because they decided they would do "anything that it takes to save [R.A.'s] life."

The sixth and seventh factors weigh in favor of terminating Jordan's parental rights. *See In re C.A.J.*, 122 S.W.3d 888, 894 (Tex.App.-Fort Worth 2003, no pet.). ("Without stability, income, or a home, [a parent] is unable to provide for the child's emotional and physical needs" and parent's instability "threatens the physical well-being of the child").

### 8. Acts or Omissions of Parent that May Indicate Existing Parent–Child Relationship is not Proper One, and
### 9. Any Excuse for Acts or Omissions of Parent

At the time of trial, Jordan testified she was taking four prescription medications

for anxiety, depression, seizures, and to help her sleep. She acknowledges she recently has periodically failed to consistently take her seizure medications. She admitted that she had not attended all of her medical appointments. Jordan stopped all psychological therapy in 2008. She has also hidden the extent of her mental instability to those that have tried to help her in this case, including Special Agent Phill.

Jordan contends, nevertheless, that her depression is under control, that her epilepsy is under control, and that she has not been hospitalized for over two years. Although she testified that recently her mental situation has improved due to its remission, Jordan did not provide any evidence that she is in remission, other than her own testimony. The OU medical records show that Jordan had been hospitalized 20 times, but Jordan's trial testimony denied it was that many. Similarly, the medical records show she had 10 to 15 suicide attempts, but at trial she could "only think of two specific times," once as a teenager and once as an adult. At trial, Jordan continued to make statements suggestive of a suicidal ideation by stating that her life is not worth living without R.A.

The record undisputedly shows the Dosseys take excellent care of R.A. emotionally and physically, and their family has a loving relationship with him. They hope to adopt him into their family. Although the record shows Jordan has had some improvement in her situation, her severe mental illness over the course of most of her life that includes numerous hospitalizations and suicide attempts show that termination is in R.A.'s best interest, particularly in light of her present minimization of the situation, failure to take medications strictly as prescribed, failure to continue to attend all medical appointments, and decision to stop therapy. The eighth and ninth factors weigh in favor of terminating

Jordan's parent-child relationship with R.A. *See Castorena,* 2004 WL 903906 at *9 (noting in termination proceedings that "[a]lthough evidence of past misconduct or neglect alone may not be sufficient to show present unfitness, the fact finder may permissibly infer that an adult's future conduct may well be measured by recent deliberate past conduct as it relates to the same or a similar situation").

## C. Conclusion of Analysis

■ Termination decisions cannot be used to reallocate children "to better and more prosperous parents." *See In re W.C.,* 98 S.W.3d 753, 758 (Tex.App.-Fort Worth 2003, no pet.). That is not the situation presented here. Although evidence shows Jordan has made some recent improvements to her past situation, those improvements cannot absolve her of her long history of irresponsible choices. *See In re J.O.A.,* 283 S.W.3d at 346 ("While the recent improvements made by [appellant] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of ... irresponsible choices.").

■ Jordan contends her misfortunes are not grounds to terminate her parental rights. A parent's lack of education, training, or misfortune is considered when reviewing excuses for acts or omissions of a parent; however, these considerations do not negate evidence tending to show that termination is in the child's best interest. *In re S.H.A.,* 728 S.W.2d 73, 89–90 (Tex. App.-Dallas 1987, writ ref'd n.r.e.). In this case, except for one inconsequential and one neutral factor, each of the best interest factors weigh in favor of concluding that termination of Jordan's parental rights is in the best interest of R.A. Although Jordan has led a life filled with various misfortunes, the trial court found the vast majority of her explanations lack-

ing in credibility and the evidence shows that placing R.A. with her would endanger him emotionally in the future. *See id.*

Jordan's plans to form a life with R.A. have not been met with actions that demonstrate an ability to execute those plans. For example, she has an apartment, but acknowledges it is unfit for a two-year old. Additionally, she takes her required medications, but not exactly as prescribed. She continues to have an interest in suicide as a solution to her problems as demonstrated by her statements that if she did not get custody of R.A. her life would not be worth living. Given her approximately 15 attempts at suicide, this continued reference to a "life not worth living" suggests she still sees suicide as a remedy for her problems. It is not in R.A.'s best interest to place him in an environment where his sole caretaker, who has attempted suicide at least 15 times, sees suicide as a solution to problems.

In light of all the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Jordan's parental rights was in R.A.'s best interest. Accordingly, we hold the evidence is both legally and factually sufficient to support the trial court's finding that termination of Jordan's parental rights was in the best interest of R.A. *See in re J.T.*, 2009 WL 2077184 at 14 (holding that evidence was sufficient to support trial court's best interest finding where mother allowed child to be in contact with individual who had physically abused her, mother was not capable of caring for child on her own, mother admitted at trial she had not found stable employment, and child was doing well in her current placement).

We overrule Jordan's first issue.

### Conservatorship Rights

In Jordan's second issue, she contends that if we reverse on the trial court's ter-

mination of Jordan's parental rights, we remand for a determination by the trial court of Jordan's conservatorship rights. Because we find that the evidence is legally and factually sufficient to uphold the trial court's termination of Jordan's parental rights, we overrule Jordan's second issue as moot.

### Conclusion

We affirm the judgment of the trial court.