

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00954-CV

**IN THE INTEREST OF I.C.**, a Child

From the 456th District Court, Guadalupe County, Texas
Trial Court No. 22-2234-CV-E
Honorable Thomas Nathaniel Stuckey, Judge Presiding

Opinion by:   Rebeca C. Martinez, Chief Justice

Sitting:      Rebeca C. Martinez, Chief Justice
            Luz Elena D. Chapa, Justice
            Beth Watkins, Justice

Delivered and Filed: April 10, 2024

AFFIRMED

Appellant ("Lindsey") appeals from the trial court's order terminating her parental rights to I.C. ("Ivy").[1] Lindsey challenges the sufficiency of the evidence to support the trial court's finding on three statutory grounds for termination under Texas Family Code section 161.001 and its finding that termination is in Ivy's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b). We affirm.

## BACKGROUND

Lindsey is the biological maternal grandmother and the adoptive mother of Ivy. Lindsey's husband, who was Ivy's biological paternal grandfather, also adopted Ivy, but he died before the

---

[1] To protect the identity of the minor child in this appeal, we refer to appellant and the child by pseudonyms. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

case began. On October 26, 2022, Ivy, then five, was taken into the possession of the Texas Department of Family and Protective Services (the "Department"). That same day, the Department filed a petition to terminate Lindsey's parental rights. The trial court held a bench trial a year later.

Nine witnesses, including Lindsey, testified at trial. The Department's investigator testified that prior to Ivy being taken into the Department's care, Ivy had "been removed by CPS in Florida" from her biological mother and placed with Lindsey and Lindsey's husband. The investigator explained that, the day before Ivy's removal, the Department received an allegation that Ivy's maternal grandfather had died, "possibly due to [an] overdose," and that "methamphetamine . . . was being used by [Lindsey] and [Ivy's biological mother] in front of [Ivy]." The investigator responded to these allegations by calling the Guadalupe County Sheriff's Department, which, according to the investigator, had incarcerated Lindsey "[f]or controlled substances." In the call, the investigator received information about the location of Ivy's family.

The investigator went to the address she was provided. There, she met a woman who the investigator believed was intoxicated. Initially, the investigator was unable to ascertain Ivy's whereabouts, but, eventually, Ivy was dropped off at the property. Although the record is not entirely clear, the investigator's testimony suggests that Ivy was dropped off by her biological mother.[2] Ivy later told the Department that she had been staying at a place where Lindsey had left her, that she did not know anyone at this place, and that she was scared. The Department took Ivy

---

[2] The Department's attorney questioned its investigator as follows:

> Q. Okay. And was [Ivy] dropped off by her biological mother?
>
> A. That we know of. We did talk to [the biological mother] on the phone, yes.
>
> Q. Okay. And was [Ivy] supposed to be with her biological mother?
>
> A. She was not supposed to be with her biological mother from what [Lindsey] had told us the next day due to her having been removed by CPS in Florida and placed with [Lindsey]. But since she was in jail, there wasn't really anybody else appropriate for her to go with.

into its possession. The next day, the investigator spoke to Lindsey at the Guadalupe County Jail, and Lindsey admitted to methamphetamine use.

Lindsey's probation officer also testified. She stated that Lindsey had been on probation since July 24, 2023 for the offense of possession of a controlled substance. An order of deferred adjudication was admitted into evidence. This order lists an offense date of October 14, 2022, which was twelve days before Ivy was removed. The order notes that Lindsey pled guilty to the offense of possession of a controlled substance. The conditions of Lindsey's probation included participation in an outpatient drug treatment program, random drug testing, and a prohibition on altering fluid samples Lindsey was to provide for drug testing. Lindsey first reported to her probation officer on August 2, 2023. The probation officer testified that, at their first meeting, she asked Lindsey for a urine sample. The probation officer warned Lindsey that providing an altered sample was a criminal offense. Lindsey, nevertheless, provided her probation officer with a sample that was cold to the touch. When the probation officer inquired about the sample, Lindsey told her probation officer that she had tampered with the sample. Lindsey then provided a sample that the probation officer knew had not been tampered with. This second sample tested positive for methamphetamine and MDMA, and Lindsey admitted to her probation officer that she had used methamphetamine on July 31 and August 1, 2023.

The day after Lindsey's meeting with her probation officer, the criminal court issued an order for Lindsey's arrest. Lindsey was arrested on August 14, 2023, when she arrived for a second meeting with her probation officer. The probation officer saw Lindsey again on August 22, 2023, when she was in custody. The probation officer offered Lindsey an opportunity to attend an inpatient drug treatment program to avoid the adjudication of her underlying drug-possession claim. To accept, Lindsey would have had to sign a waiver of a hearing and of legal assistance; if she had signed this wavier, inpatient drug treatment would have become a condition of her

probation. Lindsey, however, declined to sign the waiver. The probation officer spoke with Lindsey again on September 5, 2023, and Lindsey again declined to sign the waiver. Thereafter, the county attorney's office filed a motion to revoke Lindsey's deferred adjudication, and a hearing on the matter was set for several weeks after the termination trial.

Lindsey's third Department caseworker, whose assignment began on June 7, 2023, also testified. He had learned that Lindsey had become a live-in caregiver to an elderly couple. However, the caseworker never visited the couple's home because he was unable to arrange a visit before Lindsey was arrested. According to the caseworker, Lindsey failed to attend the majority of her appointments for drug testing. She attended seven appointments, and tested positive for drugs each time.

Lindsey's drug counselor testified that, beginning in March 2023, Lindsey had begun an outpatient drug treatment program. According to the counselor, Lindsey's sessions were going well; however, in July 2023, Lindsey tested positive for methamphetamine. The counselor reported the positive test to Lindsey's caseworker, and Lindsey was unsuccessfully discharged from treatment.

An individual who supervised Lindsey's visits with Ivy also testified. Lindsey was allowed biweekly visits with Ivy, but Lindsey attended only eight visits in the six-month period the supervisor observed. Sometimes Lindsey was late for visits. When Lindsey missed a visit, Ivy would become upset. This supervisor asked Lindsey "a couple of times" if she needed a ride, and her usual response was that "she had it under control and . . . would get it figured out."

Both of Ivy's foster parents testified. Ivy, at an early point in the case, had been placed with a maternal aunt, but she had been removed from that placement, according to the caseworker, because of "safety concerns with the caregiver." Beginning in January 2023, Ivy was placed with foster parents. Her foster father testified that Ivy gradually opened up after entering foster care.

According to the foster father, Ivy was doing well in school and was happy, but she was anxious and "a little bit behind" in her emotional development. He believed Ivy was bonded with Lindsey. Likewise, Ivy's foster mother, saw signs that Ivy missed Lindsey. Both foster parents testified that Ivy would be disappointed if Lindsey missed visitation sessions.

Ivy's counselor at the time of trial testified. The counselor had seen Ivy for an intake session and two additional sessions, and, before seeing him, Ivy had worked with another counselor. The foster parents reported Ivy's tantrums, sadness, and her difficulty concentrating to the counselor. He opined at trial that Ivy's behaviors could be attributed to grief. The counselor testified that Ivy "holds out hope" that she would be returned to Lindsey and that it appeared Lindsey and Ivy have a bond. The counselor also observed a bond between the foster parents and Ivy. Likewise, the Department's caseworker testified that Ivy was attached to her foster parents.

Last, Lindsey testified. She acknowledged her positive drug tests; however, she denied using methamphetamine around Ivy. Lindsey also acknowledged that she was unable to care for Ivy at the time of trial. Nevertheless, she asserted she could provide Ivy with a safe and stable home at the elderly couple's home where she worked prior to her incarceration. Lindsey acknowledged that Ivy had never met this couple.

After hearing the testimony, the trial court found that Lindsey knowingly placed or knowingly allowed Ivy to remain in conditions or surroundings which endangered her physical and emotional well-being, *see id.* § 161.001(b)(1)(D), that Lindsey engaged in conduct or knowingly placed Ivy with persons who engaged in conduct which endangered Ivy's physical and emotional well-being, *see id.* § 161.001(b)(1)(E), and that Lindsey had constructively abandoned Ivy, *see id.* § 161.001(b)(1)(N). The trial court also found that termination of Lindsey's parental rights was in Ivy's best interest. *See id.* § 161.001(b)(2). The trial court signed an order which terminated Lindsey's parental rights, from which Lindsey now appeals.

## STANDARD OF REVIEW

A parent-child relationship may be terminated, pursuant to section 161.001 of the Texas Family Code, only if the trial court finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and that termination is in a child's best interest. *See id.* § 161.001(b)(1), (2). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

We review the legal and factual sufficiency of the evidence under the standards of review established by the Texas Supreme Court in *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002). In reviewing the legal sufficiency of the evidence, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* at 266. "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* In reviewing the factual sufficiency of the evidence, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

## PREDICATE STATUTORY GROUNDS

The trial court determined that predicate statutory grounds (D), (E), and (N) had been satisfied with respect to Lindsey. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N). Generally, to affirm a termination judgment, an appellate court need only uphold one statutory ground and the best-interest finding. *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). However, as here, when an appellant challenges the trial court's findings under grounds

(D) or (E), due process demands that we review the evidence supporting at least one of those grounds. *Id.* at 237. Because we hold there is sufficient evidence that Lindsey endangered Ivy's well-being through her course of conduct, *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), we consider only statutory ground (E). *See In re N.G.*, 577 S.W.3d 237; *see also* TEX. R. APP. P. 47.1; *In re C.E.*, No. 23-0180, 2024 WL 875455, at *8 (Tex. Mar. 1, 2024) (holding evidence sufficient under ground (E) and not addressing ground (D)).

Termination based on subsection (E) requires a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or mental health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "Proof that a parent specifically caused an injury is not necessary." *In re C.E.*, 2024 WL 875455, at *4. Subsection (E) does not require that endangering conduct be directed at the child or that the child actually suffer injury. *Id.* In determining endangerment under subsection (E), a trial court may consider conduct both before and after the Department removed the child from the home. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). However, a finding under subsection (E) may not rest on a single act or omission; there must be "a voluntary, deliberate, and conscious course of conduct." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citation omitted).

We hold the trial court's finding as to predicate ground (E) is supported by legally and factually sufficient evidence. This case began while Lindsey was incarcerated for the offense of drug possession and ended while Lindsey was again incarcerated for violating a condition of probation that prohibited the use of illegal drugs. During the course of the termination case,

Lindsey was unsuccessfully discharged from outpatient drug treatment, and she declined an opportunity to pursue inpatient drug treatment. Her methamphetamine use was repeatedly flagged by positive drug tests. "Evidence that a parent continued to use illegal drugs even though the parent knew her parental rights were at risk is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature endangers a child's well-being." *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.) (citations omitted). Lindsey's drug use, both before and after Ivy's removal, was an endangering course of conduct.

Even if the trial court credited Lindsey's testimony that she never used methamphetamine around Ivy, her unresolved substance abuse endangered Ivy through the possibility that Lindsey would be impaired or imprisoned — a possibility which came to fruition. *See In re J.L.B.*, No. 04-17-00364-CV, 2017 WL 4942855, at *3 (Tex. App.—San Antonio Nov. 1, 2017, pet. denied) (mem. op.); *see also In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *7 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.) ("A child's emotional well-being can be negatively affected when a parent repeatedly commits criminal acts that subject the parent to incarceration, resulting in the parent's absence from the child's life and the inability to provide support, and thus creating an emotional vacuum in the child's life and subjecting the child to ongoing uncertainty regarding who will take care of him."). As stated above, subsection (E) does not require conduct directed at a child or actual injury to a child. *See In re C.E.*, 2024 WL 875455, at *4.

Moreover, Lindsey's inconsistent visitation supports a finding of emotional endangerment. Lindsey's foster parents and the visitation supervisor testified that Ivy become upset when Lindsey failed to attend multiple visits. *See In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at *5 (Tex. App.—Fort Worth June 9, 2022, pet. denied) ("A parent's inconsistent visitation can be very

damaging to a child, and can emotionally endanger a child's well-being, supporting termination under Subsection (E)." (citations and brackets omitted)).

We hold the evidence is legally and factually sufficient to support the trial court's finding that Lindsey had engaged in a course of conduct that endangered Ivy's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *J.F.C.*, 96 S.W.3d at 266.

### BEST INTEREST

Lindsey also challenges the legal and factual sufficiency of the evidence supporting the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).[3] There is a strong presumption that keeping a child with a parent is in a child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, it is equally presumed that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). In determining whether a child's parent is willing and able to provide the child with a safe environment, we consider the factors set forth in Texas Family Code section 263.307(b). *See id.* § 263.307(b).

Our best-interest analysis is guided by consideration of the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the

---

[3] In her appellate brief, Lindsey's best-interest argument consists of a sentence referencing "foregoing evidence" discussed in connection with the predicate grounds and three citations to cases without further explanation. While arguably waived by inadequate briefing, we nevertheless address the issue. *See* TEX. R. APP. P. 38.1 ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See id.*; *accord In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013). The Department is not required to prove each factor, and the absence of evidence regarding some of the factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in a child's best interest, particularly if the evidence is undisputed that the parent-child relationship endangered the safety of the child. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The focus of our review is whether the evidence, as a whole, is sufficient for the trial court to have formed a strong conviction or belief that termination of the parent-child relationship is in the best interest of the child. *Id.*

As detailed above, the evidence supports the trial court's endangerment finding under predicate ground (E). *Cf. id.* at 28 (explaining that evidence that proves one or more statutory grounds for termination may be probative in proving termination is in child's best interest). Illicit drug use is relevant to multiple *Holley* factors, including a child's emotional and physical needs now and in the future, the emotional and physical danger to a child now and in the future, parental abilities, the stability of a parent's home, and the acts or omissions which may indicate an improper parent-child relationship. *See Holley*, 544 S.W.2d at 371–72; *In re A.M.L.*, 2019 WL 6719028, at *4. Moreover, a history of arrests and incarceration is relevant to the best-interest inquiry. *See In re F.M.A.*, No. 04-16-00318-CV, 2016 WL 4379456, at *3 (Tex. App.—San Antonio Aug. 17, 2016, pet. denied) (mem. op.); *see also In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) ("A trier of fact may measure a parent's future conduct by his past conduct . . . .").

In addition, Lindsey acknowledged that she was unable to care for Ivy at the time of trial. At that time, Ivy was living with foster parents, who were able to provide for Ivy's physical and

emotional needs. Ivy's foster father testified that Ivy was happy, that she was doing well in school, and that he and his wife wished to be considered as adoptive parents if adoption became a possibility. Ivy's counselor and the Department's caseworker both testified that Ivy was bonded with her foster parents. While the evidence also indicates a bond between Ivy and Lindsey, "a child's love of h[er] parent[] cannot compensate for the lack of an opportunity to grow up in a normal and safe way equipped to live a normal, productive, and satisfying life." *In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.).

We hold the evidence is legally and factually sufficient to support the trial court's finding that termination of Lindsey's parental rights is in Ivy's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *see also In re A.B.*, 437 S.W.3d 498, 505 (Tex. 2014) (recognizing appellate court need not detail all evidence if affirming termination judgment); *In re C.H.*, 89 S.W.3d at 27 (Department is not required to prove each *Holley* factor).

## CONCLUSION

The trial court's order of termination is affirmed.

Rebeca C. Martinez, Chief Justice