**Opinion issued July 29, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-25-00136-CV

———————————

## IN THE INTEREST OF J.C., A CHILD

———————————

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-02474J**

———————————

## MEMORANDUM OPINION

This accelerated appeal arises from a suit brought by the Texas Department

of Family and Protective Services (DFPS) to terminate a parent-child relationship.

After a bench trial, the trial court terminated the parental rights of M.M. (Mother) to her minor child, "Jack."[1]  The trial court's Decree of Termination is based on its findings under subsections 161.001(b)(1)(D), (E), and (O) of the Texas Family Code and that termination of the parent-child relationship is in Jack's best interest.  The trial court also appointed DFPS as sole managing conservator of Jack.

Mother now argues that there is insufficient evidence to support the trial court's decision to terminate her parental rights and appoint DFPS as sole managing conservator.[2]

We affirm.

## Background

Jack was born in November 2017.  On October 30, 2023, when he was almost six years old, DFPS filed a petition for his protection, seeking managing conservatorship and the termination of Mother's parental rights.  By affidavit attached to the petition, DFPS Investigator Michael Danielson testified that he had received a call from Officer D. Ortega with the Houston Police Department.  Officer Ortega informed Danielson that Mother had been arrested for harassment of a

---

[1]  Pursuant to the Texas Rules of Appellate Procedure, we use an alias to refer to the child and to his parents. *See* TEX. R. APP. P. 9.8(b)(2) (providing that, in parental-rights termination cases, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member").  In its brief, DFPS refers to the child as "Jack."

[2]  *See* TEX. FAM. CODE § 263.405(a); TEX. R. APP. P. 28.4.

2

neighbor and had her son, Jack, with her. Mother would not cooperate with police officers by providing names for potential placement for Jack and, therefore, Officer Ortega needed assistance in finding a placement for Jack. Mother was the primary caregiver for Jack at the time of her arrest. Danielson attempted to contact several alleged relatives and friends of Mother's to find a suitable placement for Jack, but none of those calls were successful. Because DFPS was not able to locate an appropriate caregiver for Jack, he was removed from Mother's care and placed in a foster home.

Danielson also testified that before Mother's arrest in October 2023, DFPS had received two referrals related to Mother's care of Jack. DFPS received the first referral in July 2023. It was reported that Jack, who suffers from eczema, had "bleeding, dry, cracked skin" on his hands and feet. It was also reported that Mother drank alcohol all day and smoked marijuana in front of Jack.

DFPS received the second referral in September 2023. Then it was reported that Mother used drugs and left Jack alone for hours. It was also reported that Jack did not attend school.

On October 30, 2023, the trial court entered an emergency order of protection, finding that there existed an immediate danger to Jack's physical health or safety. It named DFPS his temporary managing conservator. After a hearing, the trial court ordered Mother to comply with the requirements set out in a DFPS Family Service

Plan (FSP) and made the FSP an order of the court. Mother's FSP required her to maintain stable housing and employment, to submit to urine analysis and hair–follicle drug testing, to refrain from criminal activity, to participate in a psychosocial assessment and parenting classes, and to attend all family visits, permanency conferences, and court hearings.

This case proceeded to trial on October 2, 2024. DFPS caseworker Davien Guidry testified that Jack had been in his current foster home placement for a few months after being removed at the request of the previous foster-home caregiver. Jack had an altercation and some behavioral incidents and that is partly why the previous foster parents requested the move. The foster agency also realized that the previous foster family was unable to meet all of Jack's needs.

Guidry testified that Jack's psychological examination suggested that he was a victim of neglect and physical abuse; therefore, DFPS sought individual therapy for him. Since then, Jack's current foster home placement has ensured that Jack attends therapy twice per week. The foster parents also ensure that Jack's educational needs are being met. Guidry testified that Jack's current placement is a stable one and that his foster parents provide Jack with food and medication on a regular basis. And they have also adjusted his eczema medication as needed.

Guidry explained that Jack's level of care was specialized due to his behavior, which includes tantrums as well as aggressive behavior against other children.

4

Guidry testified that DFPS was also concerned that Mother's own aggressive behavior was influencing Jack to act aggressively. For instance, Guidry testified that during her visits, Mother told Jack that he needed to hit back and defend himself. Accordingly, the trial court instructed Mother not to have those types of conversations with Jack.

Guidry testified that Jack has eczema that has been difficult to control. Jack was also diagnosed with post-traumatic stress disorder (PTSD). And he has received diagnoses related to child neglect, physical abuse, and upbringing away from a parent. Guidry stated that Jack's participation in the Boys and Girls Club has been helpful.

Guidry testified that Jack was prescribed medication for ADHD and mood stabilization. Jack was diagnosed with having a speech impediment as well, for which speech therapy was recommended. Jack also sees a therapist weekly. When asked about DFPS's efforts to place Jack with relatives, Guidry testified that they were looking into a relative in New York.

Guidry testified that although Mother has recently been compliant with drug testing, overall, she was not. Guidry explained that Mother had been sent to various drug-testing locations, but she had just refused to go. DFPS also introduced evidence of Mother's drug-testing results. On November 10, 2023, Mother tested positive for marijuana, cocaine, and alcohol. Mother then failed to attend, and

5

therefore was presumed to test positive, the next three random drug tests ordered in December 2023 and February 2024. Thereafter, between February 16, 2024, and August 20, 2024, Mother tested negative on nine drug tests.[3]

Guidry testified that Mother did not complete her psychological assessment but she did submit to the psychosocial assessment. Mother completed a psychiatric evaluation, drug and alcohol assessment, and completed an online parenting class. Guidry also testified that Mother completed nine classes on counseling and anger management that were recommended from the psychosocial assessment.

Although Mother completed some of the assessments required by her FSP, Guidry testified that there were concerns about her truthfulness during those assessments. With respect to Mother's psychosocial assessment, Guidry testified that the provider stated that Mother seemed to be unclear about her mental health history, past treatments, and diagnoses. Mother minimized her mental health concerns and conditions, as well as her criminal history in both New York and Texas. Furthermore, Guidry testified that Mother denied her substance abuse. During the psychosocial assessment, Mother also described her alcohol use as "once a month" or "on the weekend when she goes out." But, in the substance abuse assessment, Mother claimed that she drinks only "once a year."

---

[3]     On March 6, 2024, Mother tested negative in a urine analysis, but there was not enough hair to retrieve results from a hair follicle test. On June 24, 2024, her urine analysis results were invalid due to an abnormal pH level.

Guidry testified that, overall, Mother did not take responsibility for her actions as to why Jack came into DFPS's care. Guidry testified that Mother was very aggressive in the way that she interacted in person and via email with DFPS caseworkers, supervisors, and program directors. According to Guidry, Mother repeatedly called and texted DFPS caseworkers, during which she was irate and would yell and curse at them. Despite having completed many of the requirements of her FSP, Guidry testified that there has been no change in Mother's behavior from when the case came in.

Guidry further testified that Mother virtually visited Jack biweekly. She testified that Mother requested to have virtual visits with Jack, rather than in-person visits. Mother explained that this was because Jack had separation anxiety. Guidry testified that she believed Mother did not want Jack to have to go through that following an in-person visit.

Guidry explained that Mother is nurturing during her visits with Jack, and she tells Jack she misses him and loves him. Guidry testified that Jack has expressed a desire to be with Mother and, that during these visits, she observed a bond between Mother and Jack. Mother has also provided food, snacks, juice, clothing, and toys for Jack. But she also told Jack not to trust his foster parents and not to listen to anyone but her. And Guidry testified that there were a few instances in which

7

Mother hounded Jack about something until he put his head down and cried or she seemed to manipulate him into saying that something was wrong when it was not.

Guidry confirmed that DFPS sought termination of Mother's parental rights, and its concurrent permanency goal was relative conservatorship. Guidry testified that DFPS asked several of Jack's relatives in New York if they would be willing to take care of him, but many stated that they could not because they were afraid of Mother. Other relatives told Guidry that Mother is violent, so they do not want to get into the middle of it.

DFPS also introduced evidence of Mother's criminal history. Specifically, in 2013, while Mother was living in New York and before Jack was born, Mother stabbed a woman in the face during an altercation. Mother pled guilty to second degree assault with intent to cause physical injury with a weapon and received five years' probation.

Then in 2022, after Jack was born but while they still lived in New York, Mother ran in front of a vehicle driven by her ex-boyfriend. According to her ex-boyfriend's statement to police officers, Mother began hitting the windshield of his vehicle with a handgun. He exited his vehicle and told Mother he was calling the police. Mother then pointed the handgun at him and fired once. Mother was charged with criminal mischief with intent to damage property. She was found guilty and sentenced to time served.

Additionally, in October 2023, Mother was arrested and charged with the harassment of her neighbor. As a result of this arrest, Jack was removed from Mother's care and placed in a foster home. Mother's harassment charge was dismissed after she completed a pretrial diversion program.

Finally, in December 2023, Mother was charged with two counts of aggravated assault with a deadly weapon related to a shooting that occurred at a nightclub in Houston in September 2023—while Mother was Jack's primary custodian. According to the probable cause affidavit, after Mother allegedly got into an altercation with a woman outside the nightclub, she was seen getting into a vehicle with T.W. T.W. then "drove his vehicle toward the parking lot of the club with [Mother] in his passenger seat." T.W. purportedly positioned his vehicle so that Mother could "open fire" toward the crowd outside the nightclub. Mother then "pulled a pistol out and began firing the weapon from the passenger side window toward the crowd." Two individuals were struck by the gunfire. One of the victims suffered a gunshot wound to the face; the other to the leg. Both were transferred to the hospital in critical condition. Mother faces up to twenty years for each aggravated-assault charge.[4] She was released on a $100,000 bond and these charges were still pending at the time of trial in this case.

---

[4]  *See* TEX. PENAL CODE §§ 12.33, 22.02.

Joy Franklin, the coordinator for Court Appointed Special Advocates (CASA), testified that she made monthly visits to Jack's placement. Franklin testified that Jack has had a difficult time adjusting as he came into foster care. She testified that Jack's behaviors are consistent with that of a child who has experienced trauma.

But Franklin testified that Jack's current foster mother is doing a good job meeting Jack's needs. She testified that his foster mother is diligent in addressing Jack's physical and emotional needs, and she includes him in family activities. Franklin testified that Jack has acclimated well to this current placement and that his foster mother "works very well with him." She added that Jack is happy in his current placement.

Franklin testified that she had received some information about Mother's employment and housing, but that she had not received any proof of income or a copy of the lease from Mother's apartment.

Franklin testified that Mother was facing jail time for her current aggravated assault charges, and if Jack was returned to Mother and then she was convicted and then incarcerated, it would be "extremely traumatic" for him "and probably cause him problems for years to come."

When asked whether Jack expressed his desire regarding where he wanted to live, Franklin stated that Jack wanted to be with his mother. She said that his second choice would to be with family.

Franklin testified that CASA was not aligned with DFPS's requested relief of termination of Mother's parental rights. Instead, CASA's recommendation was for DFPS to be awarded sole managing conservator of Jack without termination. But Franklin noted that part of the reason for this recommendation was that CASA had recently received Mother's CPS and criminal records from New York, which they had not yet had a chance to review.

When trial resumed, Mother, who had recently obtained new counsel, recalled Guidry to the stand. Guidry testified that Mother drug tested 17-20 times during the case. Of those times, Mother tested positive for alcohol and cocaine once, and "no-show[ed]" on a few other occasions. Guidry testified that, typically, parents are tested weekly or biweekly and the frequency of testing is determined on a case-to-case basis.

Guidry confirmed that Mother offered to retake the substance abuse assessment. But on the day of the rescheduled assessment, Mother declined.

Regarding Mother's behavior, Guidry described it as aggressive and, at times, threatening. She added that it was more outrageous than in other cases, because Mother repeatedly called her and other workers, and yelled and cursed at them.

Guidry testified that DFPS changed its goal from reunification to termination in September, roughly two weeks before trial.

Bruce Jeffries, owner of National Screening Center (NSC), testified next that NSC had records of approximately 25 drug testing samples of Mother. He confirmed that, on November 10, 2023, Mother tested positive for alcohol, cocaine, and marijuana. Jeffries confirmed that no prescription medication would result in a positive test result for cocaine.

Mother testified next and explained that Jack was enrolled in a virtual school at age five because she felt that he was not ready to be around a big crowd. Mother also provided a certificate of accomplishment for classes and training she took during this case, in addition to those required by DFPS. Mother also provided a copy of her health insurance card and her labor union card. Mother testified that she had an open felony assault case and that her bond conditions required her to submit to random drug testing. She added that all the drug tests submitted for her criminal case were negative or else she "wouldn't be out."

Mother testified that she has an apartment in Seabrook, Texas, and that she has lived there for nine months. Mother acknowledged that there was an allegation that she was intoxicated at the time she was arrested for harassment, but that case has since been dismissed.

With respect to Jack's eczema, Mother admitted that when they first moved to Texas, she struggled to control it in the new climate until she realized she had to wrap up the affected area of Jack's skin with the medication for it to work. Mother denied ever having to take Jack to the hospital or urgent care because of his eczema. She contended that treatment of Jack's eczema was "neglected" while he has been in foster care and that she reported it "several times." It is her understanding that Jack will outgrow his eczema condition.

Mother also testified that Jack had no dental cavities at the time he was taken into DFPS custody. But since then, he has developed dental issues, including four or five cavities and has had to have a tooth removed due to infection. But she admitted that those dental issues have been treated and remediated.

Mother testified that she can provide a safe and stable home environment for Jack. She added that she could provide for him financially, explaining that she works construction when she is not pregnant,[5] does hair for a living, and receives social security, which she receives due to carpal tunnel and tendonitis. Mother, who has three other children in addition to Jack, pays child support for her other children.

Mother testified she visits with Jack virtually every other Wednesday for an hour. She acknowledged that Jack sometimes exhibits behavioral issues during

---

[5]     Mother was seven months pregnant at the time of trial. She testified that she is not "actively working right now" due to her pregnancy and because it "would be a health hazard" to her baby, but that she has a job she can go back to once she has her baby.

those visits, and she tries to be patient and give him time to calm down. She testified that she has provided Jack with food, snacks, clothes, and toys during the case.

Mother admitted that she pled guilty to attempted assault with a deadly weapon in 2013. She also acknowledged that she was found guilty of misdemeanor intentional damage of property in 2022. Mother further admitted that she has two pending aggravated-assault-with-a-deadly-weapon charges in Harris County. She admitted that she was the sole caregiver for Jack at the time of the alleged shooting serving as a basis for those charges, but she denied any involvement in that incident.

Finally, Betsi Longoria, CASA team leader, testified that CASA's termination recommendation had changed since the last trial date. CASA's recommendation is now that Mother's parental rights be terminated. Longoria explained that, at the commencement of trial, CASA did not have Mother's criminal and CPS records from New York, and they needed an opportunity to review them. Longoria explained that, in the time since, they had looked at everything and had determined that termination would be their recommendation. She testified that it is CASA's belief that termination is in Jack's best interest because he needs "to be raised by a parent who is free of drugs and free from criminal activity."

Longoria testified that Jack is currently in a foster-to-adopt placement, but that CASA would like to continue looking for a family placement. They are reviewing whether Jack may be placed with Mother's brother in New York.

14

After hearing closing arguments, the trial court took the matter under advisement. The court signed the decree for termination on February 5, 2025, terminating Mother's parental rights under subsections (D), (E), and (O), and finding that termination is in Jack's best interest.[6] And it awarded DFPS sole managing conservatorship of Jack.

## Termination of Mother's Parental Rights

Mother now argues on appeal that the evidence is legally and factually insufficient to support the trial court's findings. Namely, that she engaged in the predicate acts set forth in subsections 161.001(b)(1)(D), (E), and (O) of the Family Code and that termination of her parental rights is in Jack's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (b)(2).

## A.    Standard of Review

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Id.* at 759. "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is,

---

[6]    The unknown father's rights were terminated after the trial court received the certificate of paternity registry search.

therefore, a commanding one." *Id.* (internal quotations omitted). Thus, we strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

"[T]he rights of natural parents are not absolute," "protection of the child is paramount," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit his parental rights based on his actions or omissions—the primary focus of a termination suit is protection of the child's best interests. *Id.*

Accordingly, "[i]n parental-rights termination cases, due process mandates a clear and convincing evidence standard of proof." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019); *see also* TEX. FAM. CODE § 161.001(b). "Clear and convincing" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

"To that end, in reviewing a legal-sufficiency challenge, we must determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* (internal quotations omitted). "[W]e look at all the evidence

16

in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotations omitted). We may not, however, "disregard undisputed facts that do not support the finding." *Id.* (internal quotations omitted).

In conducting a factual-sufficiency review in this context, the court should give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). And the court should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). In a bench trial, the trial court, as factfinder, weighs the evidence and resolves evidentiary conflicts. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

## B. Applicable Law

Section 161.001(b) of the Family Code authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022); *see* TEX. FAM. CODE § 161.001(b)(1)(A)-(U), (b)(2).

Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'" *In re M.P.*, 639 S.W.3d at 702 (quoting *In re N.G.*, 577 S.W.3d at 232).

Although only one predicate ground is necessary to support a judgment of termination, we may not bypass challenges to the sufficiency of the evidence to support findings under subsections 161.001(b)(1)(D) and (E)—"the so-called endangerment grounds." *In re J.W.*, 645 S.W.3d at 748. "Those grounds bear special significance because termination of a parent's rights under either can serve as a ground for termination of his rights to *another* child." *Id.*; *see* TEX. FAM. CODE § 161.001(b)(1)(M). "[B]ecause prior termination for endangerment is a predicate ground for a future termination, due process and due course of law require that the court of appeals review the legal and factual sufficiency of the evidence supporting

a trial court's order of termination under Subsections 161.001(b)(1)(D) and (E) when challenged on appeal." *In re M.P.*, 639 S.W.3d at 704.

Because Mother challenges the trial court's findings under subsections (D) and (E), thus implicating due process concerns, we must address those findings first. *See id.*

## C.    Endangerment Findings

### 1.    Section 161.001(b)(1)(D)

Section 161.001(b)(1)(D) of the Family Code authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D).

To establish subsection (D), DFPS must prove that the parent's conduct caused a child to be placed or remain in an "endangering environment." *In re J.W.*, 645 S.W.3d at 749; *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The suitability of the child's living conditions and the conduct of parents or others in the home are relevant to this inquiry. *In re J.W.*, 645 S.W.3d at 749.

"Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in

the home is a part of the 'conditions or surroundings' of the child's home under section D." *Jordan*, 325 S.W.3d at 721. "A parent's illegal drug use . . . may also support a finding that the child's surroundings endanger his or her physical or emotional wellbeing." *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied). Under subsection (D), termination may be based on a single act or omission. *Jordan*, 325 S.W.3d at 721.

### 2. Section 161.001(b)(1)(E)

Section 161.001(b)(1)(E) of the Family Code authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E).

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A child is endangered if her environment creates a potential for danger that the parent disregards. *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty

20

and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

For instance, "[i]ntentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Abusive and violent criminal conduct by a parent can also produce an environment that endangers a child's well-being and evidence that a person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future. *Jordan*, 325 S.W.3d at 724; *Walker*, 312 S.W.3d at 617.

Although "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child, . . . incarceration does support an endangerment finding 'if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child.'" *In re J.F.-G.*, 627 S.W.3d at 312–13 (quoting *Boyd*, 727 S.W.2d at 533–34). Thus, our supreme court has held that "[a] parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *Id.* at 313.

21

Additionally, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345. "Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence." *In re N.J.H.*, 575 S.W.3d at 831. On this point, our supreme court has explained that endangerment does not require a parent's drug use to directly or physically harm the child. *See In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024). "Instead, a pattern of parental behavior that presents a substantial *risk* of harm to the child permits a factfinder to reasonably find endangerment." *Id.* (emphasis added).

Thus, a parent's "decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re N.J.H.*, 575 S.W.3d at 832 (internal quotations omitted).

"Termination under subsection (E) must be based on more than a single act or omission . . . ." *Id.* at 831. A parent's conduct prior to the child's birth and either before or after the child's removal by DFPS may be considered. *Walker*, 312 S.W.3d at 617. Offenses occurring before the child's birth can be considered as part of a voluntary, deliberate, and conscious course of conduct that has the effect of endangering the child. *Id.*

22

And "[a] parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being." *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). To support termination under subsection (E), it is not necessary to establish that a parent intended to endanger the child. *Id.* And the endangering conduct need not have occurred in the child's presence. *Walker*, 312 S.W.3d at 617.

### 3. Analysis

Here, DFPS presented sufficient evidence to support the trial court's findings that Mother engaged in conduct that endangered Jack's physical or emotional well-being and knowingly placed or knowingly allowed Jack to remain in conditions or surroundings which endangered his physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). In that regard, DFPS presented evidence that Mother has engaged in a continuing course of violent criminal activity both before and after Jack's birth. *See In re J.F.-G.*, 627 S.W.3d at 313. Only one of Mother's convictions or charges occurred before Jack was born. But courts may consider a criminal record beginning before a child's birth as evidence of an endangering course of conduct. *See In re N.L.S.*, No. 23-0965, 2025 WL 1687924, at *4 (Tex. June 13, 2025); *In re J.F.-G.*, 627 S.W.3d at 315.

The remainder occurred after Jack was born and at a time when Mother was his sole caregiver. And there is evidence that Mother committed increasingly serious crimes following Jack's birth: misdemeanor criminal mischief with intent to damage property, harassment, and aggravated assault with a deadly weapon. Thus, it is clear that Mother did not stop engaging in criminal activity after Jack was born, "when [s]he would (or should) have been aware that criminal conduct . . . risked separating h[er] from [Jack] for years." *In re J.F.-G.*, 627 S.W.3d at 315.

Moreover, each of Mother's charges or convictions involved violence or the threat of violence.[7] And three involved the use of a weapon. Critically, at the time of trial, Mother had two aggravated assault charges pending against her that involved her allegedly shooting a firearm into a crowd resulting in critical injuries to two victims. Abusive and violent criminal conduct by a parent can produce an environment that endangers a child's well-being, and evidence that a person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future. *See Jordan*, 325 S.W.3d at 724; *In re N.J.H.*, 575 S.W.3d at 832. Furthermore, although none of Mother's charges or convictions involve the physical abuse of Jack, "want of self-control[] and a propensity for

---

[7] The harassment complaint alleged that Mother "unlawfully, with intent to harass and alarm another, and in a manner reasonably likely to alarm [the Complainant], . . . *threaten[ed] to inflict bodily injury* on the Complainant, namely, an Assault." (Emphasis added).

violence may also be considered as evidence of endangerment." *In re M.M.M.*, No. 01-21-00269-CV, 2021 WL 5365102, at \*10–11 (Tex. App.—Houston [1st Dist.] Nov. 18, 2021, pet. denied) (mem. op.) (considering evidence of mother's violent criminal history as supporting trial court's endangerment finding).

And although Mother's aggravated assault charges are still pending, charged offenses themselves are relevant to the endangerment analysis, even where no criminal conviction has yet resulted. *See In re D.J.G.*, No. 01-22-00870-CV, 2023 WL 3513143, at \*15 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet.) (mem. op.).[8] If convicted of these charges, Mother faces up to twenty years in prison for each charge. *See* TEX. PENAL CODE §§ 12.33, 22.02. "An environment which routinely subjects a child to the probability that she will be left alone because her parent[ ] [is] once again jailed . . . endangers both the physical and emotional well-being of a child." *In re M.M.M.*, 2021 WL 5365102, at \*11 (quoting *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied)).

Accordingly, we conclude that this evidence of a pattern of violent criminal conduct supports the trial court's endangerment findings under subsections (D) and (E). *See In re N.L.S.*, 2025 WL 1687924, at \*4; *In re J.F.-G.*, 627 S.W.3d at 315.

---

[8] *See also In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at \*15 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.) ("[E]ven non-violent, misdemeanor offenses, and arrests for criminal conduct that do not result in conviction will support a finding of endangerment.").

Additionally, although Mother completed many of the services required by her family service plan, and there was evidence that she was nurturing and bonded with Jack during her visits, DFPS also presented evidence that Mother had a volatile temper. For instance, Guidry testified that Mother was aggressive and hostile with DFPS employees throughout the case. *See In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *10 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.) (considering evidence that mother was aggressive and hostile to DFPS employees throughout case as evidence supporting endangerment finding). Guidry also testified that DFPS had difficulty locating a family placement for Jack because many of Mother's family members considered her violent and aggressive. Moreover, DFPS introduced evidence that, although she had completed some services required by the plan, Mother had neither learned from the services nor embraced them. *See In re M.M.M.*, 2021 WL 5365102, at *12 (considering evidence mother completed services, but failed to learn from those services, as support for endangerment finding).

Finally, the trial court could have considered the evidence that Mother tested positive for cocaine, marijuana, and alcohol at the beginning of this case, as well as her refusal to submit to three subsequent drug tests. The trial court was entitled to find her failure to participate in the drug tests as equivalent to a positive test result. *See In re S.C.M.*, No. 01-22-00964-CV, 2023 WL 3873342, at *8 (Tex. App.—

26

Houston [1st Dist.] June 8, 2023, pet. denied) (mem. op.) (stating trial court may treat failure to participate in court-ordered drug test as positive test result).

Mother points to the evidence that she had numerous negative drug tests after February 2024. We agree that a parent's efforts to improve or enhance parenting skills are also relevant in determining whether a parent's conduct results in endangerment. *In re P.M.B.*, 2017 WL 6459554, at *10. Nonetheless, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . [Mother's] irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). A parent's use of illegal drugs constitutes endangering conduct because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617; *see also In re J.O.A.*, 283 S.W.3d at 345. Although Mother's drug use may not be ongoing, evidence of her past drug use is part of a course of conduct that endangered Jack's well-being because it exposed Mother to future jail time. *See In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at *15 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.); *see also Walker*, 312 S.W.3d at 617.

Thus, considering the evidence in the light most favorable to the trial court's finding under Section 161.001(b)(1)(D) and (E), we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Mother endangered Jack's physical or mental well-being. We further conclude that, viewed in light of the entire

27

record, any disputed evidence could have been reconciled in favor of a finding of endangerment under Section 161.001(b)(1)(D) and (E) or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction regarding Mother's endangerment of Jack. Accordingly, we hold that legally and factually sufficient evidence supports the trial court's findings under Section 161.001(b)(1)(D) and (E).[9]

## D. Best Interest of the Child

Mother also asserts that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in Jack's best interest. We disagree.

### 1. Applicable Law

The best-interest inquiry focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A best-interest determination is guided by several non-exclusive factors, the "*Holley* factors," including: (1) the child's desires; (2) the child's emotional and physical needs; (3) present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by

---

[9] Because sufficient evidence of only one predicate finding is necessary to support termination, we do not address Mother's challenge to the trial court's finding under Section 161.001(b)(1)(O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See id.*; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). We may also consider the statutory factors set forth in Section 263.307 of the Family Code. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d at 631 n.29.

It is not necessary that DFPS prove all of these factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. Accordingly, the absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in a child's best interest. *Id.*

### 2. Analysis

Based on the above standards, several factors support the trial court's finding here that termination of Mother's parental rights is in Jack's best interest.

For instance, Mother's continued violent criminal conduct supports the trial court's finding that termination of her parental rights is in Jack's best interest. *See In re V.V.*, 349 S.W.3d at 558 (stating that trial court reasonably could have inferred that father's consistent, and at times violent, criminal conduct would put child in his custody in emotional and physical danger now or in future). The record reflects that, while living in New York before Jack was born, Mother pled guilty to second degree

29

assault with intent to cause physical injury with a weapon after she stabbed a woman in the face. After Jack's birth, she was also convicted of criminal mischief with intent to damage property after she hit her ex-boyfriend's windshield with a handgun. A parent's inability to maintain a lifestyle free from arrests and incarcerations is relevant to the trial court's best-interest determination. *See In re E.S.T.*, 2022 WL 17096713, at \*18.

Most recently, Mother was arrested for harassment of her neighbor, which led to Jack being taken into DFPS's custody. This charge was later dismissed after Mother completed a pretrial diversion program. Then, while this case was pending, Mother was arrested on two counts of aggravated assault with a deadly weapon after she allegedly fired shots into a crowd at a nightclub, critically injuring two people. Although the aggravated assault charges were pending as of trial and the harassment charge did not result in a conviction, these charges are nevertheless relevant for to the best interest determination because each time she was jailed, Mother was absent from Jack's life and unable to provide for his physical and emotional needs. *See In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see also Holley*, 544 S.W.2d at 372 (factors two and three). And, as this Court has concluded, a parent's "unresolved criminal cases threaten her ability to maintain a stable home." *In re A.C.K.*, No. 01-25-00014-CV, 2025 WL 1738310, at \*12 (Tex.

30

App.—Houston [1st Dist.] June 24, 2025, no pet. h.) (mem. op.); *see also Holley*, 544 S.W.2d at 372 (factor seven).

Mother also tested positive for cocaine and marijuana within days after DFPS removed Jack from her care. And Mother failed to submit to three additional drug tests during the pendency of this case. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (recognizing that factfinder could reasonably infer that parent's failure to complete scheduled screening indicated she was avoiding testing because she was using drugs). This drug use exposed Mother to the possibility of incarceration and jeopardized her ability to provide for Jack physically and emotionally.

Mother's alcohol use was also a concern for DFPS throughout this proceeding. DFPS received a referral that Mother drank all day in front of Jack. At the time Mother was arrested for harassment of her neighbor, resulting in Jack being taken into DFPS custody, she was allegedly intoxicated. Further, DFPS was concerned that Mother was not truthful about the extent of her alcohol usage during her substance abuse assessment. And Mother tested positive for alcohol in November 2023. Although the record does not reflect further positive alcohol tests after that date, it demonstrates that Mother was required to refrain from drug and alcohol use and to submit to drug and alcohol testing as conditions of her bond in

the aggravated assault case. And she testified that she tested negative on subsequent tests or she "wouldn't be out."

Based on everything above, the trial court could have reasonably inferred that Mother was at risk for continuing drug and alcohol use. Thus, the evidence of Mother's drug and alcohol use was relevant to multiple *Holley* factors—including her parenting abilities and the stability of the home, as well as to Jack's emotional and physical needs now and in the future and to the physical danger in which Jack could be placed now and in the future. *See Holley*, 544 S.W.2d at 372 (factors two, three, four, and seven); *see also In re S.C.M.*, 2023 WL 3873342, at *13 (considering evidence that father tested positive for drugs one month after child was born and refused to submit to first court-ordered drug test as support for trial court's finding that termination was in child's best interest); *In re A.C.K.*, 2025 WL 1738310, at *13 (considering evidence of mother's continued alcohol use as evidence supporting trial court's best interest finding).

We note that some evidence weighs against a finding that termination is in Jack's best interest. For example, Franklin testified that Jack desired to live with Mother. And the evidence shows that Mother provided proof of stable housing, that she brought Jack clothes, shoes, and toys, and that she was loving and bonded with Jack. *See Holley*, 544 S.W.2d at 372 (factors one, two, four, and seven). She also completed many of the requirements of her family service plan.

32

But Mother also failed to take responsibility for her actions resulting in Jack coming into DFPS's care, and she demonstrated behavior indicating that the relationship between herself and Jack was inappropriate. *See id.* (factor eight). In that regard, Guidry testified that, during their visits, Mother encouraged Jack to engage in aggressive physical behavior and that the trial court ultimately ordered Mother to cease this behavior. Mother also told Jack not to trust or listen to his foster parents.

In contrast, the uncontroverted evidence showed that Jack's needs were being met in his current foster placement and that he was being well cared for and was happy.

And although Jack expressed a desire to live with Mother, he was only six— almost seven—at the time of trial. Thus, his young age renders him particularly vulnerable if left in the custody of a parent unable or unwilling to protect him or to attend to his needs. *See* TEX. FAM. CODE § 263.307(b)(1); *In re B.D.A.*, 546 S.W.3d 346, 361 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

On balance, the evidence demonstrates that the applicable statutory and *Holley* factors weigh in favor of the trial court's best-interest finding. Accordingly, considering the evidence in the light most favorable to the trial court's best interest finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of Mother's parental rights was in Jack's best interest.

We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's best interest finding or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in Jack's best interest. We therefore hold that legally and factually sufficient evidence supports the trial court's best interest finding.

### Sole Managing Conservator

Lastly, Mother argues that the trial court erred in appointing DFPS as the sole managing conservator of Jack.

When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *In re J.D.G.*, 570 S.W.3d at 856. Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d at 856.

An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parent's challenge to an order terminating his parental rights, the trial

court's appointment of DFPS as sole managing conservator may be considered a "consequence of the termination." *In re J.D.G.*, 570 S.W.3d at 856.

Because we have overruled Mother's challenges to the portion of the trial court's order terminating her parental rights, the order divested Mother of her legal rights and duties related to Jack. *See* TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 856. Consequently, Mother lacks standing to challenge the portion of the order appointing DFPS as Jack's conservator. *See In re J.D.G.*, 570 S.W.3d at 856.

## Conclusion

We thus affirm the trial court's decree of termination.


Terry Adams
Chief Justice


Panel consists of Chief Justice Adams and Justices Caughey and Johnson.